Tammy BRODOWSKI, Appellee,

v.

Steven RYAVE, M.D., Harold Byron, M.D., Mark Gernerd, M.D., Steve A. Vaganos, M.D., Montgomery Hospital, David E. Albrecht, Jr., M.D., Philip Pearlstein, D.O., E.J. Thomas, M.D., Jeffrey Striar, M.D., and Suburban General Hospital, Appellants.

Superior Court of Pennsylvania.

Argued March 9, 2005.

Filed Oct. 21, 2005.

---

Carol N. Shepherd, Philadelphia, for appellant.

Joel Gusky, Philadelphia, for Pearlstein, appellee.

Stephen G. Rhoads, Philadelphia, for Thomas, appellee.

Medford J. Brown, III, Philadelphia, for Byron, appellee.

Paul C. Troy, Norristown, for Vaganos, appellee.

Michael J. Panichelli, Philadelphia, for Montgomery Hospital, appellee.

Stanley Thompson, Voorhees, NJ, for Striar, appellee.

BEFORE: HUDOCK, FORD ELLIOTT, JOYCE, ORIE MELVIN, KLEIN, BENDER, BOWES, GANTMAN and PANELLA, JJ.

OPINION BY BENDER, J.:

¶ 1 Tammy Brodowski ("Plaintiff"), who initiated this medical malpractice case premised on the failure to timely diagnose and treat her evolving cerebrovascular accident ("CVA" or "stroke"), appeals from the October 25, 2002 order entering judgment on a jury verdict in favor of certain health care defendants. Plaintiff raises challenges to the: (1) pretrial dismissal of her corporate negligence claim against Montgomery Hospital ("Montgomery"), one of the two defendant-hospitals named in the suit; (2) dismissal by nonsuit, fol-

lowing the close of Plaintiff's case in chief, of two Montgomery defendant physicians, Steven Ryave, M.D. (an emergency room physician), and Steve A. Vaganos, M.D. (a cardiologist trained in internal medicine); (3) admission into evidence of release language from the form Plaintiff signed to discharge herself from Montgomery against medical advice ("AMA form"); (4) striking of two Plaintiff's experts' testimony against another Montgomery defendant-physician, psychiatrist Harold Byron, M.D.;[1] and (5) allegedly prejudicial remarks made by the trial court against Plaintiff and her counsel, which Plaintiff asserts resulted in an unfair trial. Plaintiff seeks a new trial. We conclude, initially, that the trial court erred by dismissing the corporate liability claim against Montgomery prior to trial (see issue (1)) and by dismissing Dr. Ryave by nonsuit following Plaintiff's case in chief (see issue (2)). Accordingly, we remand for a new trial on those grounds.

¶ 2 In May of 1996, Plaintiff filed a complaint against Montgomery and several of its physicians, i.e., Dr. Ryave, Dr. Vaganos, and Dr. Byron, and against Suburban General Hospital ("Suburban") and several of its physicians, i.e., David E. Albrecht, Jr., M.D., Philip Pearlstein, D.O., E.J. Thomas, M.D., and Jeffrey H. Striar, M.D. Essentially, Plaintiff claimed that the defendants delayed diagnosis and treatment of her evolving thrombotic stroke by failing to promptly get a neurology consult and by failing to promptly administer heparin, an anticoagulant that Plaintiff's experts generally agreed would have stopped the progression of this type of stroke. See, e.g., N.T. Trial, 2/20/01, at 144.

¶ 3 The factual chronology underlying Plaintiff's complaint began at 4:36 p.m. on June 18, 1995, when Plaintiff presented herself to Montgomery's emergency room complaining of numbness and partial paralysis on the right side of her body, and an inability to walk. See Complaint at ¶ 20; N.T. Trial, 2/16/01, at 46–47, 71; N.T. Trial, 3/1/01, at 13. At that time, Plaintiff was a 34–year old smoker who was three weeks postpartum—both risk factors for thrombotic stroke. Id. Dr. Ryave, an emergency room physician at Montgomery, was the first physician to examine Plaintiff. N.T. Trial, 3/1/01, at 13. Dr. Ryave confirmed her right sided weakness, and also reported that Plaintiff had a flat affect, that she did not seem very concerned about her deficits, and that she complained about not having much help with her newborn baby. Id. at 15–20. Dr. Ryave ordered a CAT scan of Plaintiff's head, certain laboratory tests, and an EKG. Id. at 25. These tests yielded normal results. N.T. Trial, 2/16/01, at 76; N.T. Trial, 3/1/01, at 21.

¶ 4 Based on his assessment, Dr. Ryave made a differential diagnosis [2] of CVA ver-

---

1. Dr. Byron died on July 1, 2000. The court later approved the substitution of his estate as defendant in this case. See N.T. Trial, 2/13/01, at 83.

2. A differential diagnosis is "the distinguishing of a disease or condition from others presenting similar symptoms[.]" Medline Plus Medical Dictionary, available at http://www2. merriam-webster. com/cgibin/ mwmednlm?book =Medical & va= differential diagnosis (last accessed March 31, 2005). One of Appellant's experts, Bruce Chamovitz, M.D., (hereinafter "Expert Chamovitz") who is board certified in internal medicine and infectious diseases, testified:

> A differential diagnosis is really the physician taking the information he's collected or she's collected, either by history, physical and other lab results that are available, and then putting together a group of diagnoses that they think may cause those problems. So it's basically trying to say, I think it can be A, B, C or D.
>
> And often, what they should be doing is putting those in order of severity in what's potentially fatal or catastrophic, because it

sus conversion reaction disorder, the latter of which is a psychiatric diagnosis. With regard to CVA, Plaintiff's Expert Chamovitz explained at trial that postpartum women "have a greater risk for clot formation" and, therefore, thrombotic stroke, because they are generally in a hypercoagulable state. N.T. Trial, 2/16/01, at 5, 47–48; N.T. Trial, 2/26/01, at 33. Additionally, smoking is a risk factor for stroke. N.T. Trial, 2/16/01, at 45. With regard to the alternate diagnosis of conversion reaction disorder, Plaintiff's psychiatric expert, Harry M. Doyle, M.D. ("Expert Doyle"), described it as a psychiatric diagnosis "where a person has a sudden onset of either a motor symptom, their arm doesn't move, or they're weak on one side or they're dizzy and they're uncoordinated or a sensory symptom, [sic] and they're usually either suddenly numb on one whole side of their body or numb from their foot up and their hand [sic]." N.T. Trial, 2/22/01, at 39–40. He further explained that the diagnosis of conversion reaction disorder requires an underlying psychological cause such as an event in the person's life that could relate to the onset of symptoms. *Id.* at 40. Finally, Expert Doyle emphasized that "the most important part [of the diagnosis of conversion reaction disorder] is that you have to rule out any possible medical cause that could cause similar symptoms" because conversion reaction disorder is "a rare condition." *Id.*

¶ 5 Dr. Ryave testified that, despite Plaintiff's initial normal test results, it was still possible that Plaintiff may have been having a stroke "but there were many other possibilities, and one of those possibilities being … just a stress reaction to all the things that was [sic] going on in her life." N.T. Trial, 3/1/01, at 28–29. In any

event, because Dr. Ryave did not know at that point "exactly what was going on" he determined, and it was his intention, that Plaintiff be admitted into a medical unit at Montgomery. *Id.* at 29, 35, 37. After determining that Plaintiff's family physician was Dr. Pearlstein, who did not have admitting privileges at Montgomery, Dr. Ryave, nearing the end of his shift, attempted to contact the on-call attending physician for inpatient admissions at Montgomery, whom he eventually determined was Dr. Mancini. *Id.* at 29–30.

¶ 6 Dr. Ryave asked the operator to have Dr. Mancini call him back. *Id.* Apparently, Dr. Ryave then finished his charting and was at the end of his shift. *Id.* He stated that he signed-out (*i.e.,* reported) to the ER doctor who relieved him, whom he believed was Dr. DiLeonardo. *Id.* at 31. However, Plaintiff's position throughout this case has been that Dr. Ryave did not recall to whom he signed-out to at the end of his shift and that no evidence of a proper sign-out exists. *See, e.g.,* N.T. Trial, 2/26/01, at 23 (deposition testimony of Dr. Ryave, read to the jury, wherein he stated that he did not recall the physician he signed-out to that evening).

¶ 7 In any event, by the end of his shift at 7:00 p.m., Dr. Ryave had not ruled out stroke and, indeed, stroke remained at the top of his differential diagnosis list, with conversion reaction disorder "lower down" on the differential diagnosis list, *see* N.T. Trial, 2/16/01, at 81, 91, and thus, as previously mentioned, Dr. Ryave's plan was to admit Plaintiff to a medical (rather than a psychiatric) unit. *Id.* at 81. Dr. Ryave conceded that he did not talk to Dr. Mancini or any other physician with regard to Plaintiff that evening except for the radiol-

is the responsibility of the physician to make sure first and foremost that they identify and prevent a catastrophic illness.

N.T. Trial, 2/16/01, at 55–56.

ogist who told him Plaintiff's CAT scan was normal and, presumably, the ER doctor coming on the shift at 7:00 p.m. to whom Dr. Ryave signed-off. N.T. Trial, 2/26/01, at 23. Dr. Mancini had not called back by the time Dr. Ryave left his shift. *Id.*

¶ 8 During the time Plaintiff was present in Montgomery's ER, another ER physician, Dr. Gernerd, who was working the 11:00 a.m. to 11:00 p.m. shift that day in the ER, consulted cardiologist Dr. Vaganos, who was walking through the ER. Dr. Vaganos examined Plaintiff while she was still in the ER (he was at her bedside at 7:30 p.m., *see* N.T. Trial, 2/16/01, at 146), and Dr. Vaganos communicated to Dr. Gernerd his recommendation that Plaintiff have a neurology consult.

¶ 9 Inexplicably, while still in the ER, someone told Plaintiff that she was going to be admitted into the psychiatric unit at Montgomery; and although Plaintiff initially refused, she eventually agreed and signed a consent form for admission. *Id.* at 151–52. Plaintiff was admitted to psychiatrist Dr. Byron's service after someone from the ER called him and asked if he would accept her for admission. N.T. Trial, 3/1/01, at 149. One of the mysteries of this case is the unknown person, possibly a physician, who spoke to Dr. Byron in effectuating Plaintiff's admission to the psychiatric unit. This hole in the chronology of events at Montgomery is particularly bothersome given the fact that Dr. Byron testified in his deposition that he would have never approved admission to the psychiatric unit from the ER had he known that a potential medical diagnosis, in this case stroke, had not yet been ruled-out. The record does, however, indicate that Dr. Byron did not communicate with either Dr. Ryave, Dr. Gernerd, or Dr. Vaganos during the relevant time in this case. N.T. Trial, 2/16/01, at 175.

¶ 10 In any event, by 8:15 p.m., Linda Proud, R.N., was admitting Plaintiff into the psychiatric unit at Montgomery. *Id.* at 152–153. Plaintiff at first refused admission stating, "I'm not a nut case," but then she agreed to be admitted. *Id.* at 158. Nurse Proud documented Plaintiff's complaint of right sided numbness and weakness, and noted Plaintiff's complaint of being "overly stressed for last [sic] three weeks since birth of her son." *Id.*

¶ 11 At 10:15 p.m., Nurse Proud found Plaintiff attempting to get out of bed, refusing medications, and stating that she wanted to leave the hospital. *Id.* at 163. A staff member tried to convince Plaintiff to stay. *Id.* Nurse Proud notified Dr. Byron, by phone, that Plaintiff wanted to leave. *Id.* Since Plaintiff was not incompetent or suicidal, she had the right to refuse treatment and leave. *Id.* at 163–64. Plaintiff voluntarily signed the AMA form, and was escorted out of Montgomery at about 11:00 p.m. *Id.* at 164, 166, 170–72.

¶ 12 Shortly after returning home, Plaintiff presented, via ambulance, to the emergency room at Suburban on June 19, 1995, at 2:10 a.m., with the same complaint of right-sided weakness. N.T. Trial, 2/20/01, at 26–29. Defendant Dr. Albrecht saw Plaintiff in the ER and noted that she had right-sided deficits, had been at Montgomery where she had a CAT scan, and that she had discharged herself AMA following her admission to the psychiatric unit at Montgomery. *Id.* at 28, 31. As those before him, Dr. Albrecht's initial diagnosis was "consider conversion reaction, consider CVA." *Id.* at 33–34. The notes then indicated that Plaintiff was to be admitted to a general medical floor and would be on defendant Dr. Pearlstein's service (Plaintiff's family physician who had admitting privileges at Suburban). *Id.* at 35. Accordingly, Plaintiff was admitted to a medical floor at Suburban. *Id.* at 39. At 3:00

a.m., the house doctor, Dr. Roat, assessed Plaintiff, confirming her continued right-sided deficits and making the same diagnosis, *i.e.*, CVA versus conversion reaction disorder. *Id.* at 46, 118. He recommended a psychiatric consultation, pending clearance by a neurologist. *Id.* at 119.

¶ 13 Dr. Pearlstein first saw Plaintiff at Suburban at 8:30 a.m. on June 19, 1995. *Id.* at 46, 105. His assessment yielded the same diagnosis, CVA versus conversion reaction disorder. *Id.* at 47. He ordered a panel of laboratory studies and another CAT scan, the latter of which was apparently never performed at Suburban. *Id.* at 48–49, 55. He also ordered neurology and psychiatric consults. *Id.* at 104.

¶ 14 Defendant Jeffrey H. Striar, M.D., a neurologist, saw Plaintiff at Suburban at noon on June 19, 1995. *Id.* at 51, 107, 123. He noted abnormal reflexes on Plaintiff's right side. *Id.* at 54. However, in his note, he indicated there were no signs of a stroke. *Id.* at 107. His determination was that Plaintiff had conversion reaction and not a stroke. *Id.* at 123. Defendant E.J. Thomas, M.D., a psychiatrist, saw Plaintiff at about 4:00 p.m. that same day. *Id.* at 56. Although he did not do a physical examination, after speaking with Plaintiff, he determined that she had conversion reaction disorder and recommended that she be discharged to the Institute of Pennsylvania Hospital, a psychiatric facility. *Id.* at 108–110.

¶ 15 Plaintiff stayed overnight at Suburban from June 19 to June 20, 1995. Dr. Pearlstein again saw her in the morning and noted that Plaintiff was doing better, but was continuing to have severe anxiety. *Id.* at 109. At 12:30 p.m. on June 20, 1995, Dr. Pearlstein ordered Plaintiff to be discharged to the Institute of Pennsylvania Hospital. *Id.* at 61. At the time of transfer, Plaintiff's diagnosis continued to be

CVA versus conversion reaction disorder. *Id.* at 61–62.

¶ 16 Plaintiff was admitted to the Institute of Pennsylvania Hospital on June 20, 1995, at 3:11 p.m. *Id.* at 93. After admission, Plaintiff's symptoms worsened and she experienced right sided facial weakness. *Id.* at 95. The following day, still while admitted at the Institute of Pennsylvania Hospital, Plaintiff had an MRI performed because of these worsening symptoms following her admission, which now included speech difficulties. *Id.* at 63, 192. The MRI revealed evidence of infarcted brain tissue resulting from a stroke. *Id.* at 64, 183.

¶ 17 Following the MRI, Plaintiff was transferred to a medical hospital, the Pennsylvania Medical Hospital. *Id.* at 64. An angiogram performed at 10:25 a.m. on June 23, 1995, revealed the presence and location of a blood clot in one of Plaintiff's carotid arteries. *Id.* at 165. Heparin was thereafter administered for the first time at noon, presumably to prevent any further damage from the thrombotic stroke, although there was doubt about whether, by that late point, the heparin would have any positive effects. *Id.* at 95, 165, 179, 186.

¶ 18 As noted above, Plaintiff filed a complaint in May of 1996. A jury trial commenced on February 13, 2001, with the Honorable Albert R. Subers presiding. On the same day, prior to trial commencing, motions *in limine* were presented resulting in dismissal of the corporate liability claim against Suburban. N.T. Trial, 2/13/01, at 101. Montgomery orally joined in Suburban's motion, asking the trial court to dismiss the corporate liability claim against Montgomery. Judge Subers granted Montgomery's motion and dismissed the corporate liability claim against it, but Montgomery remained in the case through the end of trial under an ostensi-

ble agency theory of negligence. Judge Subers also dismissed Dr. Albrecht from the case. *Id.* at 102. Trial commenced against the remaining defendants.

¶ 19 Plaintiff rested her case on February 27, 2001, following which Judge Subers granted Dr. Ryave's and Dr. Vaganos's motions for nonsuit, on the basis that Plaintiff's experts' testimony were in irreconcilable conflict with regard to the negligence of those two physicians. Judge Subers also dismissed Suburban on their motion for nonsuit. The remaining defendants proceeded to present their evidence, and on March 9, 2001, after almost four weeks of trial, the jury returned a verdict of "no negligence" in favor of all the remaining defendants of record. *See* N.T. Trial, 3/9/01, at 94–95.

¶ 20 On March 19, 2001, Plaintiff filed a motion for post-trial relief, seeking judgment notwithstanding the verdict or a new trial. The court denied Plaintiff's post-trial motions on August 19, 2002, following briefing and argument. Judgment was entered in favor of the defendants on August 19, 2002, and Plaintiff filed a timely appeal to this Court on August 29, 2002. That appeal was heard before a three-judge panel of this Court. Following that review, Dr. Ryave, Montgomery Hospital, and Dr. Byron petitioned for, and were granted, *en banc* review before this Court. We withdrew this Court's three-judge panel decision, and this case is now before us *en banc.*

¶ 21 Plaintiff raises the following five issues in the "Statement of the Questions Involved" portion of her brief:

1. Whether the trial court erred when it dismissed the corporate liability claim against Montgomery Hospital prior to the commencement of trial, where plaintiff's expert David Preston, M.D. had expressly and specifically criticized as substandard the care provided by Mont-

gomery Hospital in his expert report and videotaped trial testimony?

2. Whether the trial court erred when it dismissed defendants Steven Ryave, M.D. and Steve Vaganos, M.D. by nonsuit, where plaintiff presented consistent expert testimony from David Preston, M.D. and Bruce Chamovitz, M.D. of substandard care by both defendants?

3. Whether the trial court erred when it permitted defendant's counsel on several occasions to read and refer to an exculpatory clause which ostensibly released Montgomery Hospital and its physicians from liability, while refusing to give limiting instructions that the clause could not exculpate any defendant from liability?

4. Whether the trial court erred in restricting David Preston, M.D. and Harry Doyle, M.D. from offering opinions concerning the conduct of defendant Harold Byron, M.D., where the decision to bar this testimony was based upon conclusions of fact improperly determined by the trial court?

5. Whether the trial court's improper and unfairly prejudicial conduct, including accusations that plaintiff's counsel improperly coached and prompted witnesses, interfered with plaintiff's right to a fair trial?

Plaintiff's brief at 4 (suggested answers omitted). We address each question in the order presented, with subheadings corresponding to each issue. First, however, we note that Plaintiff asks us to remand this case for a new trial. Plaintiff's brief at 49. In this regard, we keep in mind the following standard and scope of review:

Trial courts have broad discretion to grant or deny a new trial. [W]hen analyzing a decision by a trial court to grant or deny a new trial, the proper standard of review, ultimately, is whether the trial

court abused its discretion. Absent a clear abuse of discretion by the trial court, an appellate court must not interfere with the trial court's authority to grant or deny a new trial. When determining whether the trial court abused its discretion, the appellate court must confine itself to the specific reasons given by the trial court for its ruling. An appellate court may reverse the trial court's decision only if it finds no basis on the record to support the reasons offered by the trial court. If support for the decision of the trial court is found in the record, the order must be affirmed. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. An abuse of discretion will not be found where an appellate court simply concludes that it would have reached a different result than the trial court. If the record adequately supports the trial court's reasons and factual basis, an appellate court may not conclude the court abused its discretion.

*Blicha v. Jacks,* 864 A.2d 1214, 1216–17 (Pa.Super.2004) (citations and quotation marks omitted).

### 1. *Dismissal of Corporate Liability Claim against Montgomery*

¶ 22 On February 13, 2001, the date this case was first called to trial, Suburban presented a pretrial motion *in limine* to preclude Plaintiff from presenting any testimony in support of her corporate liability claim against Suburban. N.T. Trial, 2/13/01, at 52; Plaintiff's brief at 12. Counsel for Suburban explained that he was presenting this motion on the morning of trial, because Expert Preston, not able to appear in court, had given videotaped testimony just three days prior to trial and counsel were awaiting transcripts. N.T.

Trial, 2/13/01, at 51–52. Following argument on Suburban's motion, the trial court allowed Montgomery to orally join in Suburban's motion. *Id.* at 72. Counsel for Montgomery received the transcripts from Expert Preston's testimony later that day and told the court that he would have a written motion filed the next morning. *Id.* at 93. At the time, however, he argued orally to the court that Expert Preston provided no testimony that would support a claim of corporate liability against Montgomery. *Id.* The trial court granted Montgomery's motion to dismiss the corporate liability claim without waiting for the written motion to be filed. *Id.* at 101.

¶ 23 The next morning, counsel for Plaintiff asked the court to clarify the previous day's ruling, because she was under the impression that counsel for Montgomery would be submitting a written motion. N.T. Trial, 2/14/01, at 3. The court indicated that it was awaiting the written motion, upon which counsel for Montgomery apologized and stated that he thought the court had ruled on the issue in its favor the previous day. *Id.* at 4. The trial court directed counsel for Montgomery to provide a written motion anyway, and then gave counsel for Plaintiff the option of whether she wanted to wait until she saw the written motion or whether she wanted to provide her oral argument at that point. *Id.* at 5. Plaintiff's counsel opted to present her argument against the motion at that time. *Id.*

¶ 24 Plaintiff's counsel argued that she would present sufficient evidence to support a *prima facie* case of corporate negligence against Montgomery. She cited Expert Preston's report in which he related the "systemic breakdown" that occurred at Montgomery wherein a series of events occurred resulting in the improper admission of Plaintiff to the psychiatric unit despite the fact that the physical cause of

her symptoms, *i.e.*, an evolving stroke, was not ruled out. *Id.* Counsel for Montgomery Hospital argued, in response, that Expert Preston's deposition testimony actually described the negligence of individual doctors and did not really describe a systemic breakdown. *Id.* at 9. Curiously, the issue was not addressed further at trial and it appears that Montgomery never did submit the written motion it had promised. Although the corporate liability claim against Montgomery was dismissed prior to trial, the agency liability claim against Montgomery survived through trial, with the jury eventually finding in Montgomery's favor on that issue.

¶ 25 Plaintiff now argues that the trial court acted abruptly and summarily by allowing Montgomery to join in Suburban's motion *in limine,* and she further argues that the court's pretrial dismissal of her corporate negligence claim against Montgomery was error because the factual underpinnings of her claim against Suburban differed from the factual underpinnings of her claim against Montgomery, which differences Plaintiff contends were not recognized by the court. With regard to the standard we should apply when reviewing this issue, Plaintiff contends that a trial court's decision to dismiss a defendant prior to trial should be characterized as either a grant of summary judgment or a grant of judgment on the pleadings. Plaintiff's brief at 15 (citing *Lewis v. United Hosps.,* 547 Pa. 626, 692 A.2d 1055 (1997)). Thus, Plaintiff contends that we must view the evidence that she sought to present in the light most favorable to her, the losing party, on this particular issue. *Id.* (citing *Welsh v. Bulger,* 548 Pa. 504, 698 A.2d 581, 584 (1997)). We agree and conclude, initially, that this issue has merit.

¶ 26 The Supreme Court of Pennsylvania first recognized a cause of action in corporate liability against a hospital in *Thompson v. Nason Hosp.,* 527 Pa. 330, 591 A.2d 703, 708 (1991), in which it adopted "as a theory of hospital liability the doctrine of corporate negligence or corporate liability under which the hospital is liable if it fails to uphold the proper standard of care owed its patient." Since then, "Pennsylvania [has recognized] the doctrine of corporate negligence as a basis for hospital liability separate from the liability of the practitioners who actually have rendered medical care to a patient. The doctrine creates a non-delegable duty on a hospital to uphold a proper standard of care to patients." *Rauch v. Mike–Mayer,* 783 A.2d 815, 826 (Pa.Super.2001).

¶ 27 "A hospital is directly liable under the doctrine of corporate negligence if it fails to uphold any one of the following four duties[,]" *id.,* that the *Thompson* Court delineated:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Thompson,* 591 A.2d at 707 (citations omitted). These duties run directly from the hospital to the patient. *Rauch,* 783 A.2d at 827. Accordingly,

> an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action for corporate negligence. Corporate negligence is based on the negligent acts of the institution itself. "A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employ-

ees." Thus, a corporation is held directly liable, as opposed to being vicariously liable, for its own negligent acts.

*Id.* (citations omitted).

¶ 28 With the four duties and the nature of a corporate negligence claim in mind, we now examine the three elements necessary to establish a *prima facie* case of corporate negligence. The plaintiff must establish all of the following:

1. [the hospital] acted in deviation from the standard of care;
2. [the hospital] had actual or constructive notice of the defects or procedures which created the harm; and
3. that the conduct was a substantial factor in bringing about the harm.

*Id.* (citation omitted). Expert testimony may be required to establish the first and third prongs: "Unless a hospital's negligence is obvious, an expert witness is required to establish ... that the hospital deviated from the standard of care and that the deviation was a substantial factor in bringing about the harm." *Id.* The experts need not use "magic words" when expressing their opinions relating to standard of care and causation. *Welsh v. Bulger*, 548 Pa. 504, 698 A.2d 581, 586 (1997).

¶ 29 On the other hand, expert testimony may not be required to establish the second prong, *i.e.,* whether the hospital had actual or constructive notice. In the instant case, Plaintiff does not argue that Montgomery had actual notice; instead, Plaintiff argues that there was enough evidence to establish constructive notice. Thus, with regard to constructive notice:

It is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. If the attending physician fails to act in accordance with standard medical practice, it is incumbent upon the hospital staff to so advise hospital authorities in order that appropriate action might be taken. A hospital is properly charged with constructive notice when it "should have known" of the patient's condition. Furthermore, constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. We interpret "failure to enforce adequate rules and policies" as an analog to "failure to provide adequate supervision."

*Rauch,* 783 A.2d at 828 (citations omitted). For example, a hospital will be charged with constructive notice when its nurses should have known about a patient's adverse condition, but failed to act. *See, e.g., Whittington v. Episcopal Hosp.,* 768 A.2d 1144, 1154 (Pa.Super.2001). In such cases, we have said that "constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision." *Id.*

¶ 30 We now undertake to apply the above principles in light of the evidence Plaintiff sought to present in support of her corporate liability claim against Montgomery. First, we will examine whether Plaintiff had sufficient expert evidence to support the first and third elements of the *prima facie* case, as the matters pertaining to these elements are not so obvious to be within the comprehension of the average layperson. Second, we will examine evidence Plaintiff sought to proffer that may have supported a finding of constructive notice—the second element of the *prima facie* case, which does not necessarily require expert testimony.

¶ 31 In her brief, *see* Plaintiff's brief at 13, Plaintiff cites to the following statements of Expert Preston, derived from his report, in support of her contention that the hospital deviated from the standard of care.

1. "**Opinion:** Upon reviewing medical records, in addition to the information obtained from the depositions of the doctors, it appears that there was a clear breakdown in triage the evening [Plaintiff] presented to Montgomery Hospital." Expert Preston's Report, 11/21/99, at 3.

2. "After Dr. Ryave left his shift, the subsequent care of [Plaintiff] at Montgomery Hospital fell below the standard of good medical care. An obvious breakdown of triage occurred that ultimately resulted in [Plaintiff] not being admitted to a medical floor, and inappropriately admitted to a psychiatric floor." *Id.*

3. "[T]here is no notation in the medical record of which E.R. physician took over for Dr. Ryave after he left his shift at 7:00 p.m. Thus, it would appear that whoever took over and was directing her case ... did not actually see or talk to [Plaintiff]." *Id.* at 4.

4. "In summary, there was a clear system breakdown in the care that [Plaintiff] received at Montgomery Hospital." *Id.* at 5.

Further, in his videotaped trial deposition, when asked what his opinion was with regard to whether or not the care provided to Plaintiff at Montgomery complied with accepted standards of care applicable in June of 1995, Expert Preston stated: "My opinion is that the standard of care at Montgomery Hospital in June of 1995 fell below the standard of good medical care for a patient presenting with symptoms and signs suggestive of stroke." Expert Preston's Deposition, 2/10/01, at 114. The questioning continued as follows:

Q: And in particular respects, would you please explain to the jury how that system failed to comply with accepted standards of care in terms of the events which took place in the emergency room?

A: Well, my opinion with regards to the events at Montgomery Hospital, there was a systems breakdown.

. . .

Q: Well, specifically doctor, was it a departure from accepted standards of care for no one at Montgomery Hospital to have this lady seen by a neurologist?

A: It was.

. . .

Q. [D]o you have an opinion, doctor, within a reasonable degree of medical certainty as to the role of the hospital in terms of its duty to supply competent physicians who comply with the standard of practice in the care of [their] patient[s] and to ensure quality care for their patients under the circumstances presented here with the physicians caring for [Plaintiff], and whether or not that was within the standard of care?

. . .

A. I do agree that the hospital does have a responsibility to oversee their physicians who practice medicine in a responsible way within the standards of good medical care, and I do believe that the standards of medical care were breached that evening [when Plaintiff]— at Montgomery Hospital with the physicians who saw her that evening, where she was ultimately very inappropriately mislabeled a conversion reaction and admitted to a psychiatry service where she had a true organic problem, which in no way could a reasonable person have excluded at that point.

*Id.* at 114, 117, 126–127.

¶ 32 Plaintiff argues that the duties implicated in this case involve Montgomery's "failure ... to enforce adequate rules and polices, as well as a failure to oversee and supervise its physicians with respect to

triage of patients from the emergency room to hospital admission, and transfer of patients at shift changes." Plaintiff's supplementary brief at 6. We agree that the above proffered testimony of Expert Preston, when viewed in the light most favorable to Plaintiff, was sufficient to establish a breach of a standard of care applicable to Montgomery. Expert Preston's testimony could have supported a finding that the hospital failed to oversee its physicians, one of the duties enumerated in *Thompson*. What occurred at Montgomery could be described as a chain of missteps whereby each physician who examined Plaintiff recognized a differential diagnosis of CVA versus conversion reaction disorder and, still, through an unknown individual reporting to Dr. Byron, who himself had no specific recollection what he was told, Plaintiff was admitted to the psychiatric unit with an outstanding physical diagnosis of CVA and no neurology consult. Both Dr. Byron and Nurse Proud agreed that physical causes for symptoms would have to first be ruled out before admission to the psychiatric unit. Yet, this did not occur, thereby providing Plaintiff with evidence of Montgomery's failure to oversee or supervise.

¶ 33 We also agree with Plaintiff that she presented evidence upon which a jury could find constructive notice on the part of Montgomery Hospital. In *Whittington*, for example, we stated that constructive notice could be demonstrated where the "failure to receive actual notice is caused by the absence of supervision." *Whittington*, 768 A.2d at 1154. In support of her argument that she would have presented sufficient evidence, given the chance, that Montgomery had constructive notice, Plaintiff claims that every physician who saw her there recommended a neurological assessment; no neurological assessment was ever done at Montgomery; due to inadequate shift-change procedures, Plaintiff's care was transferred to an unknown ER physician when Dr. Ryave left his shift; the identity of the physician assuming responsibility for Plaintiff was not in the chart; the identity of the physician who spoke with Dr. Byron about Plaintiff's admission to the psychiatric unit was not in the chart and remains unknown; no one ruled out CVA; and Plaintiff was admitted to the psychiatric unit instead of a medical unit where her evolving stroke could have been treated, despite the fact that the physicians who saw her that evening recommended a neurology consultation to address the remaining differential diagnosis of CVA. *See* Plaintiff's supplemental brief at 7. Whereas Expert Preston described the systems breakdown that resulted in the inappropriate admission to the psychiatric unit, Plaintiff intended to present this other evidence in support of her position that Montgomery had constructive notice of this systems breakdown.

¶ 34 Given the unusual circumstances under which the trial court granted Montgomery's motion to dismiss the corporate liability claim against it (*e.g.*, the abrupt manner in which the motion was granted despite the lack of oral argument, and the failure of Montgomery's counsel to provide a written motion in contravention of the trial court's express direction) and given that we must view the evidence in the light most favorable to Plaintiff, we conclude that Plaintiff should have been at least given the chance to present, in her case in chief, evidence to establish a corporate claim against Montgomery. The record does not support the trial court's decision to dismiss this claim prior to trial without affording Plaintiff this opportunity. Accordingly, this case is remanded for a new trial on the corporate liability claim against Montgomery.

### 2. Compulsory Nonsuits in Favor of Dr. Ryave and Dr. Vaganos

¶ 35 In her second issue, Plaintiff argues that the trial court erred by granting nonsuits in favor of defendants Dr. Ryave and Dr. Vaganos at the close of her case in chief. We first note as follows:

> [a] motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiffs' evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a nonsuit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered. A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

Shay v. Flight C Helicopter Servs., 822 A.2d 1, 13 (Pa.Super.2003) (quoting Parker v. Freilich, 803 A.2d 738, 744–45 (Pa.Super.2002) (citations omitted)).

¶ 36 In the instant case, the trial court granted Dr. Ryave's and Dr. Vaganos's motions for nonsuit based on its finding that two of Plaintiff's experts, Expert Preston and Expert Chamovitz, presented conflicting testimony on the issue of negligence. In reaching its decision, the trial court relied upon the rule enunciated in Mudano v. Philadelphia Rapid Transit Co., 289 Pa. 51, 137 A. 104 (1927) (the "Mudano rule"). As further described below, we initially conclude that the trial court erred by granting Dr. Ryave's motion for nonsuit but properly granted Dr. Vaganos's motion for nonsuit.

¶ 37 A brief discussion of Mudano is first necessary. In Mudano, the plaintiff suffered a fractured heel in an accident and, over a year later, developed an ulcer and an infection on the same heel. At trial, he presented two experts, who differed in their opinions as to the cause of the plaintiff's heel infection. One expert opined that the infection was caused by an infected blister from an ill-fitting shoe, while the other opined that the infection was attributable to the accident. Referred to as the Mudano rule, our Supreme Court stated that a plaintiff's medical experts' testimony must be reasonably consistent, and that where the "testimony was so conflicting regarding the proper inference to be drawn as to render either one of two inconsistent inferences possible of adoption, the adoption of the one or the other would be nothing more than a guess, and, under such circumstances, plaintiff fails to sustain the burden of proof which the law casts upon him." Mudano, 137 A. at 106. Noting the specialized knowledge of medical experts upon which the jury must rely, the Supreme Court further stated that, "[i]f plaintiff calls more than one expert, there must be no absolute contradiction in their essential conclusions[,]" and that the plaintiff has a "duty to furnish consistent, and not inconsistent, advice—otherwise the jury would be confused rather than instructed." Id. at 107. In other words, a plaintiff fails to sustain his burden of proof where he presents two scientific experts who "so vitally disagree on essential points as to neutralize each other's opinion evidence." Id. at 108.

¶ 38 The Supreme Court revisited the Mudano rule in Brannan v. Lankenau

*Hosp.*, 490 Pa. 588, 417 A.2d 196 (1980), and emphasized that "conflicts in [expert] testimony are fatal only if absolute." *Id.* at 200. In *Brannan*, which dealt with one plaintiff's expert, our Supreme Court ruled that the trial court improperly removed the issue of negligence from the jury where the expert equivocated in his testimony by stating, first on direct examination, that the defendant doctors' conduct fell below the standard of care, then testifying on re-direct the following day that he could not state whether the doctors' conduct fell below the standard of care, and then, finally, during the same re-direct examination, reaffirming his initial testimony. *Id.* The Court concluded that such equivocation was a "relatively minor divergence in only a part of [the expert's] testimony, when viewed against the testimony as a whole" and, therefore, did not "sufficiently compromise[ ] the [expert's] testimony on direct to justify removal of this issue from jury consideration." *Id.* (footnote omitted).

 ¶ 39 In the instant case, contrary to the trial court's conclusion on this issue, we conclude that the opinions of Expert Chamovitz and Expert Preston did not irreconcilably conflict on the issue of Dr. Ryave's duty and breach of that duty. Expert Chamovitz testified that Dr. Ryave breached the standard of care by failing to admit Plaintiff to a "proper place prior to his departure" even though he had more than two hours to do so. N.T. Trial, 2/16/01, at 110. He also cited Dr. Ryave for failing to effectuate the proper consultation with a neurologist, and for failing to properly sign-out to the oncoming ER doctor. *Id.* at 110–111. Expert Chamovitz stated, for example, "if you've identified a life threatening illness, you better darn well be sure that you've set the proper things in motion before you leave." *Id.* at 112.

¶ 40 Expert Preston testified that Dr. Ryave "did a very good job in his evaluation and assessment" of Plaintiff. Expert Preston's Deposition, 2/10/01, at 114. He stated that Dr. Ryave intended Plaintiff to be admitted to a medical floor for further evaluation of the differential diagnosis. *Id.* at 114–115. Expert Preston stated that Dr. Ryave "did a good job in his evaluation, but something fell apart after he left. He was meant to properly convey to the ER doctor who was taking over that this patient needed to be admitted to the hospital for evaluation of stroke, but something went awry at that point." *Id.* at 115. Expert Preston also testified that "part of [Dr. Ryave's] job was to ... appropriately sign her out when he left his shift at 7:00 p.m. There was clearly some kind of breakdown that occurred at that point." *Id.* at 147.

¶ 41 The experts' testimony did not present an irreconcilable conflict such that the *Mudano* rule would apply to neutralize their opinions with regard to Dr. Ryave's care. Both experts' opinions were consistent in that Dr. Ryave may not have properly signed out before his departure. Moreover, although Expert Preston stated that Dr. Ryave's evaluation, assessment, and differential diagnosis were proper, Expert Chamovitz did not specifically opine on these issues but, rather, opined on issues of treatment implementation. Overall, the two experts' testimony did not present a *Mudano* conflict and the trial court erred by granting Dr. Ryave's nonsuit on that basis.

 ¶ 42 On the other hand, Expert Preston and Expert Chamovitz were in irreconcilable conflict on the issue of the standard of care applicable to Dr. Vaganos. "Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice *plaintiff*

*must present expert testimony to establish the applicable standard of care,* the deviation from that standard, causation and the extent of the injury." *Toogood v. Owen J. Rogal, D.D.S., P.C.,* 573 Pa. 245, 824 A.2d 1140, 1145 (2003) (emphasis added). As the following analysis demonstrates, the trial court did not err by applying the *Mudano* rule to remove the issue of Dr. Vaganos's liability from the jury because Plaintiff's experts provided irreconcilably conflicting opinions on this essential point.

¶ 43 The record reveals that Dr. Vaganos is a cardiologist who was "passing through" the ER at Montgomery Hospital and was asked by Dr. Gernerd, the ER doctor present at the time, to "look at [Plaintiff] and render an opinion." N.T. Trial, 2/26/01, at 128, 130. Dr. Vaganos assessed Plaintiff and orally recommended to Dr. Gernerd that Plaintiff be seen by a neurologist. *Id.* at 138–39. Plaintiff's expert, Expert Chamovitz, testified on direct examination as follows:

My opinion is that the medical care that Dr. Vaganos rendered was not consistent with the standard of care in 1995. I believe that his care was substandard. And I believe that for a variety of reasons: First, as a medical consultant, he has admitting privileges to the hospital. If he identifies a life-threatening or potentially catastrophic illness, he has complete authority and ability to admit that patient to the hospital on his service, and consult whoever he wishes, including a neurologist. He does not have to simply write it in the chart and disappear.

There's no evidence of any follow-up in the medical record from Dr. Vaganos. So I believe as a medical consultant who clearly had an understanding of stroke and its potential risks, he did not discharge his responsibilities to the patient at all.

. . .

The standard of care would be that he either personally would consult neurology or admit the patient to his service, if he's entertaining the diagnosis of stroke as a possibility, which he indicated in his testimony. It was his responsibility to act on those promptly, which he did not.

He also understands the use of heparin and he certainly has the ability to initiate IV heparin, which was the appropriate treatment.

. . .

[T]he delay in diagnosis and treatment by Dr. Vaganos directly contributed to the ultimate catastrophic outcome. N.T. Trial 2/16/01, at 98–100. On cross-examination, Expert Chamovitz reiterated that he thought Dr. Vaganos should have either (1) admitted the patient under his own service, proceeded with a neurology consult, and initiated heparin therapy, or (2) consulted neurology from the emergency room. *Id.* at 183, 190. Expert Chamovitz testified that Dr. Vaganos had to "see it through" and agreed that merely orally recommending a neurology consultation was insufficient. *Id.* at 184–85.

¶ 44 Contrastingly, Expert Preston, whose deposition testimony was read at trial, testified that Dr. Vaganos' recommendation that Plaintiff be seen by a neurologist was "a good idea" and that it was Plaintiff's *admitting physician's duty* to obtain a neurology consultation. Expert Preston's Deposition, 2/10/01, at 116–117. Specifically, when Expert Preston was asked about Dr. Vaganos' recommendation that Plaintiff be seen by a neurologist, Expert Preston stated:

It would have been a good idea to have her seen by a neurologist. But as Dr. Ryave earlier testified to, that often the neurologist was decided upon by the at-

tending doctor. It was the practice at Montgomery Hospital to admit the person to medical service and have the admitting medical doctor get the neurologist involved. It would have been fine— it would have been a good idea to have a neurologist see her in the Emergency Room as Dr. Vaganos had recommended, or conversely to have gone through with what Dr. Ryave indicated, that you admit her to the medical service and let the doctor decide on a neurologist to see and evaluate her.

*Id.* According to Expert Preston, it was not Dr. Vaganos' duty to consult neurology, but rather the admitting physician's duty to do so. This opinion is in absolute conflict with Expert Chamovitz's opinion that, not only was it Dr. Vaganos' duty to follow through beyond his recommendation and obtain the neurology consultation himself, but that he could have also admitted Plaintiff to his own service, treated her with heparin, and obtained the neurology consultation. If the trial court had allowed the issue to reach the jury, the jury would

have been faced with the impossible task of resolving Plaintiff's conflicting expert testimony on the essential issue of the standard of care applicable to Dr. Vaganos. The jury would have been only able to guess as to whether Dr. Vaganos, who appears to have been pulled aside by Dr. Gernerd as he was passing through the ER, did or did not have a duty to consult a neurologist himself. Such conjecture and speculation is what the *Mudano* rule is meant to prevent. Accordingly, the trial court did not err by applying the *Mudano* rule to remove this issue from jury consideration.[3]

### 3. Admission into Evidence of Release Language in AMA Form

■ ¶ 45 Next, Plaintiff argues that the trial court erred by denying her motion *in limine*, made at the beginning of Montgomery's case in chief in which the court allowed Montgomery to have Nurse Proud read release language from the AMA form to the jury. This allegation of error is waived because the release lan-

---

**3.** Alternatively, Plaintiff argues that Dr. Vaganos was not entitled to a nonsuit pursuant to Pa.R.C.P. 230.1 ("Compulsory Nonsuit at Trial"), as this rule existed at the time of trial (*i.e.*, prior to July 1, 2001, the general rule was that a nonsuit was precluded when defense evidence was presented during a plaintiff's case-in-chief), because Dr. Vaganos presented evidence, in the form of deposition counter-designations, which amounted to defenses during the presentation of Plaintiff's case-in-chief. In response to this argument, Dr. Vaganos contends that his counter-designations did not amount to a presentation of his defenses during Plaintiff's case, but were, rather, an acceptable means of clarifying testimony and placing testimony presented by Plaintiff into context as specifically permitted by Pa.R.C.P. 4020(a)(4) ("Use of Depositions at Trial"), which provides that "[i]f only part of a deposition is offered in evidence by a party, any other party may require the offering party to introduce all of it which is relevant to the part introduced, and any party may introduce any other parts." We re-

viewed the counterdesignations that Plaintiff complains about and conclude that they did not amount to an injection of Dr. Vaganos' defenses into Plaintiff's case such that would preclude the trial court from entering nonsuit in Dr. Vaganos' favor. *Cf. Deiley v. Queen City Bus. Ctr. Assocs.*, 757 A.2d 956, 958 (Pa.Super.2000) (reversing grant of nonsuit in favor of defendant where defendant, during plaintiff's case-in-chief, presented three defense exhibits and elicited testimony on cross-examination that supported a defense to plaintiff's negligence claim). We note that former Rule 230.1, which was in effect during the trial in the instant case, permitted the entry of a compulsory nonsuit "before any evidence on behalf of the defendant has been introduced[.]" *See* Pa.R.C.P. 230.1 cmt. (2001). Since the trial in this case, Rule 230.1 has been amended to now allow a trial court, when deciding a motion for compulsory nonsuit, to disregard any evidence favorable to the defense that was introduced during the plaintiff's case-in-chief. Pa.R.C.P. 230.1(a)(2) & cmt. (2001).

guage was introduced on the first day of trial during cross examination of Expert Chamovitz at which time Plaintiff failed to lodge a timely objection. *See* N.T. Trial, 2/16/01, at 167. *See also* Pa.R.E. 103(a)(1) (indicating that when a litigant challenges the admission of evidence, the issue is preserved where there is "a timely objection, motion to strike or motion *in limine* appear[ing] of record, stating the specific ground of objection, if the specific ground was not apparent from the context"); *Yacoub v. Lehigh Valley Med. Assocs., P.C.,* 805 A.2d 579, 588 (Pa.Super.2002) ("A motion *in limine* is a procedure for obtaining a ruling on the admissibility of evidence prior to or during trial, but before the evidence has been offered.").

### 4. *Striking of Plaintiff's Experts' Testimony Regarding Dr. Byron's Care*

¶ 46 Plaintiff argues that the trial court improperly struck the testimony of Expert Preston, and improperly limited the testimony of Expert Doyle, with regard to their opinions on the care provided by Montgomery psychiatrist Dr. Byron. "[T]he admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." *Woodard v. Chatterjee,* 827 A.2d 433, 440 (Pa.Super.2003) (quoting *Walsh v. Kubiak,* 443 Pa.Super. 284, 661 A.2d 416, 419 (1995) (*en banc* )).

¶ 47 In his deposition, Dr. Byron testified that he could not recall with whom he conversed, and the content of this conversation, when accepting admission of Plaintiff into his unit, but that that person must not have told him that stroke was not ruled-out of the differential diagnosis because, if he had known that stroke remained in the differential diagnosis, he would have never admitted Plaintiff to the psychiatric unit. No other evidence exist-ed with regard to what Dr. Byron was told. Plaintiff sought to introduce testimony from both experts that: If Dr. Byron had been told that the diagnosis of CVA had been ruled out, he did not breach the standard of care by admitting Plaintiff to the psychiatric unit; however, assuming he had been told that CVA had not been ruled-out, then Dr. Byron did breach the standard of care. Plaintiff argues that the trial court improperly precluded this expert opinion at trial. However, according to our review of the record, we find that the trial court *did* permit this expert opinion to be expressed to the jury by Expert Doyle on direct examination by Plaintiff's counsel:

Q [D]o you have an opinion with respect to whether or not the conduct of Dr. Byron complied with accepted standards for a psychiatrist under the circumstances?

A I do.

Q Okay. Now, I'm going to ask you two different questions and I'd like you to answer the questions separately: First, I'd like to ask you to assume that Dr. Byron was informed that a stroke or CVA had been ruled out for [Plaintiff] in that telephone call where he agreed to admit her to the psychiatric floor. Are you with me?

A Yes.

Q Under those circumstances, if we assume the accuracy of that fact, do you have an opinion, with reasonable medical certainty, as to whether or not Dr. Byron complied with accepted standards of care?

A Yes. Under those circumstances he did comply with accepted standards of care in admitting her to the unit.

Q Okay. Now, I'd like to ask you a different question:

. . .

Let me ask you to assume ... that in that telephone conversation, Dr. Byron was informed that the possibility of stroke or conversion reaction was still under evaluation for [Plaintiff], do you have an opinion, with reasonable medical certainty, as to whether or not the conduct of Dr. Byron complied with accepted standards of care?

A Yes, I do.

Q Please tell us.

A Yes. It would be negligent to admit a person, where the consideration of stroke was actively being evaluated, to a psychiatric unit. So it would be an inappropriate admission, deviation of the standard of care.

Q Can you explain the basis for your opinion, sir?

A Yes. Stroke is similar to a heart attack. It's a potential medical emergency. And as we said earlier, until all medical conditions are ruled out, you would not arrive at a diagnosis of conversion disorder.

So given the fact that it is considered a medical emergency and the condition had not been completely ruled-out, it would be inappropriate to put an active medical patient on a psychiatric unit until their condition was stabilized.

N.T. Trial, 2/21/01, at 1844–45, 1847–48. The trial court permitted Plaintiff to present this expert opinion; accordingly, to the extent that Plaintiff complains that the trial court precluded such testimony, her complaint is belied by the record.

■ ¶ 48 Additionally, Plaintiff sought to introduce expert testimony with regard to what Dr. Byron *should have known* based on the information that existed at the time of Plaintiff's admission to the psychiatric unit at Montgomery (*e.g.*, information such as the fact that CVA remained in the differential diagnosis at that time), or what inquiries Dr. Byron should have made to the unknown person who reported to him that night. We conclude that the trial court properly precluded expert testimony on this issue because such opinions would be beyond the fair scope of either expert's report. *See* Pa.R.C.P. 4003.5(c) (precluding expert from testifying at trial to opinion that goes beyond fair scope of his testimony in discovery proceedings). In *Woodard*, we examined the underlying purpose of Rule 4003.5:

> [I]n determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." *The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.*

*Woodard*, 827 A.2d at 442 (quoting *Feden v. Consolidated Rail Corp.*, 746 A.2d 1158, 1162 (Pa.Super.2000) (citations and internal quotation marks omitted)). In the instant case, Expert Preston's report dated November 21, 1999, contains no opinion with regard to what Dr. Byron should have known or what inquiries, if any, he should have made to the unknown person who reported to him that night. Expert Doyle's report dated December 17, 1999, is similarly lacking. Any expert testimony on this question would have presented unfair surprise to Dr. Byron, as both experts' opinions were limited to the following: (1) if Dr. Byron was told CVA remained in the

differential, he was negligent for admitting Plaintiff to the psychiatric unit; or (2) if he was told CVA was ruled-out, he was not negligent. As noted above, this expert opinion was presented to the jury at trial. The question of what Dr. Byron should have known based on the medical information available at the time and what inquiries he should have made was simply not covered by either Expert Preston's or Expert Doyle's report and, therefore, was properly precluded as beyond the fair scope of either experts' report.

### 5. *Intemperate Judicial Remarks*

¶ 49 With regard to Plaintiff's last issue, we conclude, following careful review of the places Plaintiff has directed us to in the record, that the trial court did not make remarks about Plaintiff's counsel and witnesses that undermined her right to a fair trial. Plaintiff enumerates nine instances of alleged bias and concludes, in summary fashion, that "the trial court's highly improper comments, derogatory remarks about [Plaintiff's] counsel and criticisms of [Plaintiff] herself negatively influenced the jury, by undermining the credibility and integrity of both [Plaintiff] and counsel." Plaintiff's brief at 48. We have reviewed Plaintiff's complaints and conclude that none of them warrant a new trial against all defendants, as Plaintiff requests.

¶ 50 Based on the analysis set forth herein, we award a new trial with respect to Plaintiff's claims against Dr. Ryave and her corporate liability claim against Montgomery.

¶ 51 Judgment affirmed in part, reversed in part, remanded for new trial.

¶ 52 Judge HUDOCK, Judge FORD ELLIOTT and Judge GANTMAN join in the majority decision.

¶ 53 Judge JOYCE, Judge ORIE MELVIN, Judge KLEIN, Judge BOWES and Judge PANELLA join in part.

¶ 54 Judge JOYCE files a concurring and dissenting opinion in which Judge ORIE MELVIN joins and Judge BOWES joins in part.

¶ 55 Judge BOWES files a concurring and dissenting opinion.

¶ 56 Judge PANELLA files a concurring and dissenting opinion in which Judge JOYCE, Judge ORIE MELVIN and Judge BOWES join in part.

¶ 57 Judge KLEIN files a concurring and dissenting statement.

CONCURRING/DISSENTING OPINION BY JOYCE, J.:

¶ 1 Upon careful review of the record and consideration of the law, I do not agree with the Majority that the trial court erred when it dismissed Montgomery Hospital from the case after finding that Appellant could not present any evidence to support its claim of corporate negligence. Additionally, I would find that the issue regarding the admission of the Against Medical Advice form was not waived, and even if it was, that judicial economy warrants consideration of the merits of the issue. Accordingly, I dissent from the Majority on these two issues and join the dissent of my esteemed colleague, Judge Panella, regarding the admission of the AMA form. As to all the remaining issues, however, I join the Majority's results.

¶ 2 Regarding the corporate negligence claim against Montgomery Hospital, Appellant would have been required to proffer expert testimony to establish that Montgomery Hospital, as an institution, deviated from the accepted standard of care in connection with fulfilling one or more of the four duties enunciated in

*Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). *See* Majority opinion, at 1056–57. Appellant needed to show that Montgomery Hospital was directly liable for its own negligent acts as opposed to the negligent acts of individual staff members. *Rauch v. Mike–Mayer,* 783 A.2d 815, 827 (Pa.Super.2001).

¶ 3 In his expert report, Dr. Preston states that "there was a clear breakdown in triage the evening [Appellant] presented to Montgomery Hospital. ... An obvious breakdown of triage occurred that ultimately resulted in [Appellant] not being admitted to a medical floor, and inappropriately admitted to a psychiatric floor." Dr. Preston's Expert Report, 11/21/99, at 3. Nowhere in the report, however, is there any indication that these "breakdowns" were the result of Montgomery Hospital's direct negligence, as opposed to a deviation from the accepted standard of care by individual doctors or nurses. For example, while Dr. Preston asserts that Appellant was improperly admitted to a psychiatric floor instead of a medical floor, he does not opine whether the problem occurred as a result of an error made by a doctor or nurse or if it was because Montgomery Hospital breached of one the duties outlined in *Thompson.* The absence of a defined duty and subsequent breach by the hospital itself renders Dr. Preston's report inadequate to allow a case of corporate negligence against Montgomery Hospital to go forth. Therefore, in my opinion, the trial court properly dismissed that claim and rightfully precluded that theory from being submitted to the jury.

¶ 4 Regarding the admissibility of evidence pertaining to the AMA form, because this case is being remanded and may result in another trial, guidance on the propriety of admitting evidence relative to the AMA form is necessary. This issue was of obvious importance to the parties during the first trial as it was repeatedly litigated. Undoubtedly, without a determination of the AMA form's admissibility, the issue will present itself again. I agree with Judge Panella that the AMA form is not admissible and join that portion of his dissent disposing of that issue.

¶ 5 In conclusion, I join the Majority's findings as they relate to Dr. Ryave, Dr. Vaganos, Dr. Boyle, and the alleged intemperate judicial remarks. I respectfully dissent from the Majority's conclusion that the court erred in dismissing the corporate negligence theory against Montgomery Hospital and from the finding that the challenge to the admissibility of the AMA form was waived. Instead, I join Judge Panella's dissent as it pertains to the AMA form's admissibility.

## CONCURRING AND DISSENTING OPINION BY BOWES, J.:

¶ 1 After a thorough review of the briefs, the law, and the cogent writings of my learned colleagues, I must agree in part with some of the conclusions drawn by the author of the Majority, the Honorable John Bender, and with certain dissents. Specifically, I join Judge Bender with regard to his conclusion that the trial court erred in granting a motion for a nonsuit in favor of Dr. Steven Ryave. I also agree with Judge Bender that the trial court was correct in its ruling to grant a nonsuit in favor of Dr. Steve Vaganos. Finally, I agree with Judge Bender's treatment of the alleged intemperate remarks.

¶ 2 I dissent, however, from the Majority in its conclusion that the trial court erred when it dismissed Montgomery Hospital from the case after finding that Appellant could not present any evidence to support its claim of corporate negligence. Instead, I join the Honorable Michael Joyce in his reasoning and conclusion that

the corporate negligence claim against Montgomery Hospital was properly dismissed by the trial court.

¶ 3 I also dissent from the Majority's conclusion that the issue of the admission of the Against Medical Advice form was waived and again join Judge Joyce's dissent in which he concludes that judicial economy militates in favor of an analysis of this issue on the merits. I, too, conclude that the AMA form was not properly admitted and join the reasoning as articulated by the Honorable Jack Panella in his dissent.

¶ 4 In addition, I join that portion of Judge Panella's dissent pertaining to the exclusion of the expert testimony of Dr. Preston on the issue of Dr. Byron's standard of care.

CONCURRING/DISSENTING
OPINION BY PANELLA, J.:

¶ 1 I join in the Majority's well reasoned opinion with respect to the claims against Montgomery Hospital and Dr. Steven Rayve. Furthermore, I find that Plaintiff's complaints regarding comments made by the trial court are now moot, given my conclusion that Plaintiff is entitled to a new trial on other grounds and the fact that the trial judge has since retired. However, I must respectfully dissent from the Majority's opinion with respect to the claim against Dr. Vaganos, the admission of the AMA letter, and the exclusion of the expert testimony of Dr. Preston on the issue of Dr. Byron's standard of care.

¶ 2 The Majority concludes that the trial court properly granted Dr. Vaganos's motion for nonsuit because the expert testimony offered by Dr. Preston and Dr. Chamovitz conflicted on the issue of standard of care. I agree with the Majority's reading of *Mudano,* however, I cannot agree with the Majority on its applicability to the present case.

¶ 3 In support of its conclusions, the Majority cites to a relevant portion of Dr. Preston's testimony. Majority Opinion, at pages 1062–63. Furthermore, the Majority cites to a relevant portion of Dr. Chamovitz's testimony. Majority Opinion, at pages 1062–63. In using these selected portions of the experts' testimony, the Majority purports to find an irreconcilable conflict. Specifically, the Majority concludes that Dr. Preston's opinion absolved Dr. Vaganos of any follow-up responsibility with respect to Plaintiff. In contrast, the Majority concludes that Dr. Chamovitz's opined that Dr. Vaganos had an absolute duty to ensure that Plaintiff be properly evaluated by a neurologist in a timely manner. However, the Majority creates this conflict only by neglecting other, equally relevant portions of both experts' testimony.

¶ 4 In particular, the Majority fails to recognize that Dr. Preston testified that

Dr. Vaganos agreed with the diagnosis of conversion disorder, probably a diagnosis that a cardiologist should not be agreeing with. And for reasons that are unclear, [the Plaintiff] inappropriately got admitted to a psychiatry service who was truly having a stroke.

N.T. 2/10/01, at 115. Dr. Preston further opined that

It is my opinion that it was a departure from the standard of medical care that the failure to admit [the Plaintiff] to a medical service, delayed her evaluation. It allowed more time for the stroke to continue, which later then resulted in a permanent deficit. Valuable time was lost in being admitted to the psychiatry service at Montgomery Hospital.

*Id.* at 119. These passages illustrate that, in Dr. Preston's opinion, the failure to admit the Plaintiff to the medical service was a serious breach in the standard of

care by all physicians who had observed the Plaintiff at that point. Dr. Preston faulted Dr. Vaganos for his failure to ensure that the Plaintiff was admitted to a medical service which would then have been responsible for obtaining a neurological consult. This failure was at least possibly connected to Dr. Vaganos's diagnosis of conversion disorder, a diagnosis "that a cardiologist should not be agreeing with." [4] Therefore, while Dr. Preston did not believe that Dr. Vaganos was responsible for personally obtaining a neurological consult, he did fault Dr. Vaganos for failing to ensure that Plaintiff was admitted to the medical service at Montgomery Hospital, where she would have been evaluated by a neurologist.

¶ 5 Similarly, as noted by the Majority, Dr. Chamovitz opined that the failure to obtain a neurological consult was a breach of the standard of care owed by Dr. Vaganos. More importantly, Dr. Chamovitz was cross examined regarding whether he disagreed with Dr. Preston's opinion:

> I think if a neurologist had seen [the Plaintiff] in the emergency room, we wouldn't be sitting here today. *I think that it is not acceptable entirely just to make a recommendation and disappear.* So I think that there is—okay, you could say there's a subtle difference between what Dr. Preston is saying and what I'm saying. But do you say do I disagree with his conclusion? No. I agree with his conclusions that a substandard of care [sic] was given.
>
> Can there be nuances, differences? I suppose. But I thoroughly agree with his conclusion.

N.T. 2/16/2001, at 189 (emphasis added). As demonstrated by the above passage, Dr. Chamovitz explicitly agreed with Dr.

Preston's opinion. Any attempt to classify Dr. Chamovitz's opinion as in direct conflict with Dr. Preston's opinion is belied by the explicit testimony of Dr. Chamovitz.

¶ 6 Furthermore, a close examination of the opinions reveals that, as Dr. Chamovitz explicitly noted, any conflict between the opinions was a matter of nuance. The major difference between the two opinions was that Dr. Preston believed that Dr. Vaganos was responsible for ensuring that Plaintiff was admitted to a medical service, thereby ensuring a neurological consult. In contrast, Dr. Chamovitz believed that Dr. Vaganos was personally responsible for ensuring the neurological consult. Accordingly, both experts opined that Dr. Vaganos had a responsibility to ensure that Plaintiff was seen by a neurologist.

¶ 7 The distinction between the opinions of Dr. Preston and Dr. Chamovitz is far from the absolute, irreconcilable conflicts prohibited by *Mudano.* To the contrary, the difference in the opinions was a "relatively minor divergence in only a part of [the expert's] testimony, when viewed against the testimony as a whole." *Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196, 200 (1980). Accordingly, it was error for the trial court to remove the issue from jury consideration. *Id.*

¶ 8 With respect to the admission of the release language in the AMA form, I must dissent to the majority's conclusion that the issue is waived in its entirety. I agree that Plaintiff did not make any objection to the use of the form during opening statements or during the cross examination of Dr. Chamovitz. However, prior to the testimony of Nurse Proud, during Montgomery Hospital's case in chief, Plaintiff filed a *motion in limine* seeking to prevent

---

**4.** The connection is qualified as "possible" because there was no direct testimony as to the reason Plaintiff was admitted to the psy- chiatry service with a differential diagnosis of CVA, as discussed *infra.*

Nurse Proud from discussing the form. The trial court denied the *motion in limine,* stating that "it's a jury question as to whether it is worth anything." N.T., 3/1/2001, at 75. Therefore, the issue of whether Nurse Proud could testify to the exculpatory language in the form was properly preserved for our review. Clearly, plaintiff raised the issue of the relevancy of the AMA form prior to Nurse Proud's testimony. The mere fact that the AMA form was referenced earlier at trial does not *ipso facto* render it relevant for all other purposes at trial. Furthermore, as the claim against Montgomery Hospital has been re-instated, it is prudent for reasons of judicial economy to address this issue which is certain to arise again in the trial court.

¶ 9 In Pennsylvania, "[e]vidence that is not relevant is not admissible." Pa.R.E., Rule 402, 42 Pa. Cons. Stat. Ann. Relevant evidence is defined as evidence "having any tendency to make the existence of any *fact* that is of consequence to the determination of the action more probable or less probable." Pa.R.E., Rule 401, 42 Pa. Cons. Stat. Ann. (emphasis added). The trial court, in its opinion pursuant to Pa.R.A.P. Rule 1925, stated:

> This release language was applicable only to liability that could result from [the Plaintiff's] discontinuance of treatment, and the jury could not have failed to understand this. No such liability or defense was asserted in the case.... [W]e fail to see how it could have any impact on the verdict in this case.

Trial Court Opinion, 12/3/2002, at 11. I agree with the trial court that the exculpatory language in the AMA form had no relevance to any of the legal theories at issue in this case. Therefore, I conclude that it was error for the trial court to admit such irrelevant evidence.

¶ 10 Finally, I must dissent from the Majority's decision to affirm the exclusion of Dr. Preston's testimony and the limiting of Dr. Doyle's testimony regarding the standard of care owed by Dr. Byron to the Plaintiff. The Majority finds that the limited testimony presented by Dr. Doyle somehow cures any possible error committed by the trial court in striking Dr. Preston's testimony. I cannot agree.

¶ 11 The fact that Dr. Doyle was permitted to briefly testify as to his opinion of Dr. Byron's actions does not act to remedy the trial court's error. The trial court's action in preventing Dr. Doyle from expounding on his opinion and explaining his rationale, compounded with the exclusion of Dr. Preston's similar testimony, could reasonably be expected to impact on the weight the jury assigned to Dr. Doyle's opinion.

¶ 12 Furthermore, the Majority attempts to classify Dr. Preston's and Dr. Doyle's opinions as outside the scope of their expert reports. Specifically, the majority attempts to pigeonhole the testimony of these two physicians as attempting to opine on what "Dr. Byron should have known or what inquiries, if any, he should have made to the unknown person who reported to him that night." Majority Opinion, at page 1065. However, a close review of the expert reports as well as the actual testimony belies the Majority's conclusion.

¶ 13 In his expert report, Dr. Preston opines that

> [P]atients should never be admitted to a psychiatric service with a possible stroke. Patients would only be appropriately triaged to a psychiatry service once organic illness has been excluded. That clearly wasn't the case here. Dr. Byron testified that it was represented to him that organic neurologic illness had been excluded or he would have

never admitted the patient to the psychiatry service. In the alternative, if we assume hypothetically that Dr. Byron was informed that the differential included possible CVA, then it would have been a departure from good medical care for him to have agreed to her admission on his service, particularly if he knew he was not personally going to be in and examine the patient that evening.

Expert Report of Dr. Preston, 11/21/1999, at 4. The relevant portion of Dr. Preston's testimony that was stricken contains the following passage:

> I do have an opinion, but I think my opinion is somewhat complicated because there is somewhat conflicting evidence here.
>
> I do think there's departure from the standard of good medical care for a psychiatrist to admit a patient to their service if stroke is still a differential diagnosis. So as Dr. Rosenfeld wrote, the diagnosis of being conversion disorder versus CVA, that was still a differential diagnosis. Then it was very inappropriate of that person being on the psychiatrist service to make that determination. However, if one were to assume that Dr. Byron was strongly told that organic neurologic disease had been completely excluded and there was certainly a psychiatric problem, then one could make the argument that it would have been appropriate.

N.T., 2/10/2001, at 123–124. Clearly, both Dr. Preston's expert report and testimony deal with hypotheticals, as a crucial fact was in dispute. The crucial fact at issue was what Dr. Byron had been told before admitting Plaintiff to psychiatric service at Montgomery Hospital. Dr. Byron testified that he did not specifically remember that he had been told that CVA had been ruled out, rather, he assumed that he had acted in accordance with his routine response of not accepting a patient under such circumstances. However, documentary evidence did not reveal that any physician had ever evaluated Plaintiff in order to exclude CVA. Accordingly, a reasonable mind could come to the conclusion that Dr. Byron had not been informed that CVA had been excluded. As such, it was perfectly appropriate to use hypotheticals to explore the reasonableness of Dr. Byron's actions based upon what he may have been told. Therefore, I would conclude that it was error to exclude Dr. Preston's testimony.

¶ 14 The same holds true for Dr. Doyle's expert report and testimony. Dr. Doyle's expert report opines:

> If Dr. Byron was informed that Tammy Brodowski was being evaluated for stroke and that the diagnosis of stroke was still being actively considered in the differential diagnosis at the time of her admission to the psychiatric unit, it is my opinion, within a reasonable degree of medical certainty, that Dr. Byron's decision to admit Ms. Brodowski was negligent, deviated from the standard of care and was substantial factor in the delay in diagnosis and treatment of Ms. Brodowski's underlying medical condition.

Expert Report of Dr. Doyle, 12/17/1999, at 9. As quoted by the Majority opinion at page 1064–65, Dr. Doyle's testimony similarly faulted Dr. Byron's conduct if it were assumed that Dr. Byron had not been informed that CVA had been ruled out. As such, Dr. Doyle's testimony was not outside the scope of his expert report, and therefore it was error for the trial court to limit his explanation of how he arrived at his opinion.

CONCURRING AND DISSENTING OPINION BY KLEIN, J.:

¶ 1 I hesitate to write further, considering the thorough discussions of both the

majority and the dissent. However, after reviewing exactly what happened, I reach different conclusions with respect to the different defendants.

My conclusions would be the following:

¶ 2 1. I would affirm the grant of nonsuit on behalf of Dr. Ryave. Even were Dr. Ryave found to be negligent, any negligence would not be a substantial contributing factor to the harm. The record is clear that the next emergency room physician *did* know of the order to have a neurological consult, and in fact followed through to ask a passing cardiologist for confirmation.

¶ 3 2. I would affirm the grant of nonsuit on behalf of Dr. Vaganos, the cardiologist, since he only participated in a brief consultation in which he stated that no definitive diagnosis should be made until there was a neurological consult.

¶ 4 3. I would affirm in part and deny in part the grant of summary judgment in favor of Montgomery Hospital. The pleadings only claimed (a) corporate negligence; and (b) vicarious liability *for named physicians.* All the named physicians were found not responsible, and there was no pleading claiming negligence on the part of others on the hospital staff. However, as noted below, I believe the court erred in excluding evidence against the Montgomery Hospital psychiatrist, Dr. Byron. Therefore, since a new trial is warranted against Dr. Byron, Montgomery Hospital could be found responsible on an ostensible agency theory for Dr. Byron's actions and therefore should be part of a new trial.

¶ 5 (a) Corporate Liability. There was no showing that there was a *systemic* problem with hospital supervision, hiring, regulations, etc., which is what is required for corporate liability under *Thompson v. Nason Hosp.,* 527 Pa. 330, 591 A.2d 703 (1991). While there may have been errors that night on the part of hospital staff beyond the named physicians to which the Montgomery Hospital was *vicariously* liable, that was not pled. There was no showing of any *systemic* problems that would have resulted in any errors on that particular night.

¶ 6 (b) Vicarious liability for the actions of named physicians. Since Dr. Ryave and Dr. Vaganos were properly dismissed by way of nonsuit, and other doctors were found not responsible by the jury, there was no vicarious liability on the part of Montgomery Hospital regarding those doctors.[5]

¶ 7 (c) As noted below, there is evidence of ostensible agency for the psychiatrist, Dr. Byron, and Montgomery Hospital could be responsible on a vicarious liability theory for his actions.

5. I note that a neurological consult was later done by Dr. Striar at Suburban General Hospital. Neurologist Dr. Striar did not make a diagnosis of stroke, although he anticipated doing a CAT scan later after sufficient time had passed, so the CAT scan might have revealed a stroke. However, when Dr. Striar returned to the hospital, Brodowski had been moved to the Institute of the Pennsylvania Hospital (a psychiatric hospital), where her condition worsened. Then she was transferred to the medical unit of Pennsylvania Hospital, where an MRI revealed the stroke. The defense position, to which the jury probably agreed, was that *did* have a conversion reaction, which was the primary diagnosis of almost all of the physicians who saw her initially was that she probably did not have a stroke. The defense contended that Brodowski did not have symptoms of a stroke until she reached the Institute of the Pennsylvania Hospital, so either the physicians could not diagnosis a stroke or the stroke did not occur until she was at the Institute of the Pennsylvania Hospital. Her symptoms definitely worsened at the Institute of the Pennsylvania Hospital.

¶ 8 4. I agree with the dissent that the trial court improperly limited the testimony of Dr. Doyle and Dr. Preston, criticizing Dr. Byron's actions, and would grant a new trial against Dr. Byron. I believe that the dissent points out where the proposed testimony of Dr. Doyle *did not* go beyond their expert reports and this well could have made a difference in the verdict in favor of Dr. Byron. Since the only notation in the file was a request for a neurological evaluation, the jury could find that Dr. Byron did not ask enough questions when there was the referral to the psychiatric unit, a theory somewhat different than the hypothetical questions proposed to him. Therefore, I believe there should be a new trial against Dr. Byron, and, therefore, also against Montgomery Hospital on an ostensible agency theory.