J-A26020-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JOHN MATUSEK, SR., SPOUSE AND EXECUTOR OF THE ESTATE ANGELINE P. MATUSEK | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JAMES R. BRUNO, M.D., THOMAS J. CASTELLANO, M.D., JOHN ROTHSCHILD, M.D., GARY DECKER, M.D., MARK BERNARDI, D.O., GEISINGER WYOMING VALLEY MEDICAL CENTER, GEISINGER HEALTH SYSTEM FOUNDATION | |
| Appellees | No. 279 MDA 2014 |

Appeal from the Order Entered December 9, 2013
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 4735 of 2006

BEFORE:  BOWES, J., MUNDY, J., and JENKINS, J.

DISSENTING MEMORANDUM BY MUNDY, J.:     **FILED FEBRUARY 05, 2015**

I respectfully dissent from the conclusion reached by both the trial court and the Majority that Executor did not carry his burden of establishing the minimum necessary to survive a nonsuit in this case.  Trial Court Opinion, 3/18/14, at 25; Majority Memorandum at 16.  After a thorough review of the certified record, the parties' briefs, and the relevant law, I disagree that the judgment of compulsory nonsuit in favor of Drs. Decker and Castellano was proper.

The Majority has correctly detailed the appropriate scope and standard of review employed in examining a judgment of compulsory nonsuit. Specifically, nonsuit is only proper when it is clear that a plaintiff has not established a right to relief or cause of action. Majority Memorandum at 6, *citing* **Staiger v. Holohan**, 100 A.3d 622, 624 (Pa. Super. 2014) (internal citations omitted); **see also** Pa.R.C.P. 230.1. In assessing whether a plaintiff has established a right to relief, the plaintiff must be given the benefit of all favorable evidence and all reasonable inferences derived therefrom. Majority Memorandum at 6, *citing* **Staiger**, **supra**. Further, any conflicts in the evidence must be resolved in the plaintiff's favor. **Id.** However, as the following discussion illustrates, despite observing the appropriate standard, the trial court and the Majority fail to afford Executor, plaintiff below, the benefit of all reasonable inferences derived from the favorable evidence adduced at trial or to resolve conflicts in evidence in Executor's favor.

The Majority notes that the trial court's analysis was based, in large part, on **Mudano v. Phila. Rapid Transit Co.**, 137 A. 104 (Pa. 1927) and **Brodowski v. Ryave**, 885 A.2d 1045 (Pa. Super. 2005) (*en banc*) (plurality), *appeal denied*, 897 A.2d 449 (Pa. 2006). Majority Memorandum at 5. Indeed, the trial court recognized Executor "relies significantly" on our Supreme Court's decision in **Brannan v. Lankenau Hosp.**, 417 A.2d 196 (Pa. 1980) but finds that "such reliance is misplaced." Trial Court Opinion,

3/18/14, at 8.  This finding is erroneous.[1]  Similarly, while the Majority fairly recounts the salient principles elucidated by our Supreme Court's decision in *Brannan*, it curiously fails to apply these binding principles of law to the case herein.  *See* Majority Memorandum at 8-9.

As noted in the Majority Memorandum, *Brannan* involved a single expert witness who gave inconsistent testimony on behalf of the plaintiff in that case.  Majority Memorandum at 8.  The Majority recognizes that our Supreme Court reiterated, in *Brannan*, that for a plaintiff's case to fail based on contradictory expert testimony, the "experts must so vitally disagree on essential points as to neutralize each other's opinion evidence." *Id.*, *citing Brannan*, *supra* at 200.  Indeed, the Majority notes that the Supreme Court, in holding the compulsory nonsuit was improperly granted, again acknowledged that conflicts in expert testimony are fatal to a plaintiff's case **only if they are absolute**.  *Id.* at 9 (emphasis added), *citing Brannan*, *supra*.  Thus, the "relatively minor divergence in only a part of

---

[1]  Not only is this finding erroneous, the trial court also plainly mischaracterizes *Mudano.*  *See* Trial Court Opinion, 3/18/14, at 5.  The trial court posits that *Mudano* established, "expert testimony from plaintiff's experts in a medical negligence action must remain reasonably consistent in order to survive a Motion for Compulsory Non-Suit … ." *Id.  Mudano* did not involve a medical malpractice action.  Rather, the plaintiff in *Mudano* sought to recover damages arising from an injury to his foot, suffered while working on a public highway.  *Mudano*, *supra* at 53-54.  The issue of the defendant's and plaintiff's respective negligence in causing the injury were not under review.  *Id.* at 54.  The appeal involved the legal sufficiency of the expert testimony to sustain the award of damages.  *Id.*

[plaintiff]'s expert testimony, when viewed against the testimony as a whole, [did not] sufficiently compromise the witness' testimony on direct to justify removal of th[e] issue from jury consideration." **Brannan**, **supra**. It bears emphasis that in **Brannan**, the Court recognized that after the decision in **Mudano**, "this Court has allowed juries to consider and resolve conflicts among expert witnesses." **Id.** (citation omitted).

The Majority observes this Court found the application of the **Mudano** rule in **Brodowski** was appropriate where experts proffered testimony in irreconcilable conflict on the standard of care as to one defendant physician, Dr. Vaganos.[2] Majority Memorandum at 9-10. However, the analysis provided by the Majority is silent regarding the other defendant physician in that case, Dr. Ryave. **See id.** Though we affirmed the grant of compulsory nonsuit in favor of the physician the Majority discusses, we reversed the grant of compulsory nonsuit as to the other defendant physician, Dr. Ryave.

_____

[2] I note the **Brodowski** opinion was extremely fractured regarding the five issues the appellant raised, with only three judges joining the opinion in full. In separate writings, a majority of the Court agreed with the opinion as to both the reasoning and result of the disposition on the issue of nonsuit as to the two defendant doctors. **Id.** at 1066 (Joyce, J., concurring and dissenting), 1067 (Bowes, J., concurring and dissenting); **see also, e.g.**, **Commonwealth v. Brown**, 23 A.3d 544, 555 (Pa. Super. 2011) (observing, "[i]n cases where a concurring opinion enumerates the portions of the plurality's opinion in which the author joins or disagrees, those portions gain precedential value.") (citation omitted). Nevertheless, this Court's decision is controlled by **Brannan**. **See Bell v. Willis**, 80 A.3d 476, 479 (Pa. Super. 2013) (stating, "[a]s an intermediate appellate court, this Court is obligated to follow the precedent set down by our Supreme Court.") (citation omitted), _appeal denied_, 89 A.3d 1282 (Pa. 2014).

We concluded the experts' testimony did not irreconcilably conflict on the issue of Dr. Ryave's duty and breach. *Brodowski*, *supra* at 1061. The first expert opined that Dr. Ryave breached the standard of care by "failing to admit [the] [p]laintiff to a proper place prior to his departure even though he had more than two hours to do so." *Id.* (citation and internal quotation marks omitted). This expert criticized Dr. Ryave's failure to arrange a consultation with a neurologist and for not signing out the patient appropriately to the oncoming emergency room physician. *Id.* (citation omitted). The second expert opined that Dr. Ryave "did a good job in his evaluation, but something fell apart after he left. He was meant to properly convey to the ER doctor … that this patient needed to be admitted to the hospital for evaluation of stroke, but something went awry at that point." *Id.* (citation and internal quotation marks omitted). In declining to find an irreconcilable conflict between the two expert opinions, the Court noted the second expert opined that Dr. Ryave's "evaluation, assessment, and differential diagnosis were proper," while the first expert opined on issues of treatment implementation and did not address, specifically, evaluation, assessment, and diagnosis. *Id.* Therefore, the testimony of the two experts did not neutralize each other's opinions as to Dr. Ryave's care, and nonsuit was improper. *Id.*

Contrary to the trial court's and Majority's conclusion, the instant case does not present a situation where two inconsistent inferences are possible

- 5 -

of adoption from the testimony of Drs. Lipsky and Weissman. The experts testified there were deviations from the standard of care, and those deviations caused harm to Decedent. In order to demonstrate that the experts' opinions did not irreconcilably conflict, a more in depth reproduction of the testimony is warranted. Dr. Lipsky testified, to a reasonable degree of medical certainty, as follows.

> The deviations, most importantly, were not recognizing the signs of acute abdomen in this patient who had severe pseudomembranous C. Diff colitis, who rapidly deteriorated on the 28th, and who would have had a better chance of survival had this been addressed over a day before it was actually addressed.

N.T., 9/9/13, at 55. Regarding the administration of antibiotics to Decedent, Dr. Lipsky testified Vancomycin was "more effective for a more severe case of colitis," and it should have been administered earlier to Decedent. *Id.* at 57. His explanation for this opinion follows.

> … So, on April 26th, [2004], the patient -- on admission, the patient was started on Flagyl, which I think was a reasonable choice of an initial antibiotic.
>
> However, I think that the antibiotic – there was concern in this patient who was changed to NPO, no food, that whatever medicine was being administered orally was not reaching the appropriate location in the colon. I would have had a much earlier threshold to start the patient on intravenous antibiotic; Flagyl, being the only one approved for this.
>
> What I would like to do, even as of 2004, is changing the patient to oral Vancomycin at the time

I did IV Flagyl [April 27, 2004] to just to try to see if we could get an oral medication into the patient.

… [A]ll of us who were in gastroenterology at the time had anecdotal experience of Vancomycin being more effective for a more severe case of colitis.

*Id.* at 56-57. Following that testimony, Dr. Lipsky opined that the deviations identified were ultimately involved in causing Decedent's death and that the deviations increased the risk of harm to Decedent. *Id.* at 57-58.

On direct examination, Dr. Weissman testified as follows relevant to the issue of antibiotic treatment.

[Counsel for Executor:]

Q. All right. Doctor, in terms of the medicines available to treat, there was testimony yesterday that [Decedent] came in with an oral medication for Flagyl and then on the 27th was changed to I.V. introduction of Flagyl. Can you comment on that change?

[Dr. Weissman:]

A. The reason – that – there was nothing wrong with that. I mean, that's sometimes done in situations where you are concerned that the medication orally isn't being delivered where you want it to be delivered.

Q. All right. Let's talk about the introduction of Vancomycin that occurred, I believe, on the 28th. Could you discuss the issues relating to that?

A. Yes. Again, I – that was perfectly reasonable to do that. You know, the problem that I mentioned about wondering whether it was going to get where

you needed it to go – but at that point, where clearly [Decedent] was getting sicker, … that was an appropriate addition to try -- the thing about Vancomycin orally is it's not absorbed, and it just basically, as it makes its way down, it – you know, -- there's a high concentration of the drug in the intestinal -- in the inside of the intestine, which is where you want it to be. So at this point … that was an appropriate addition.

N.T., 9/12/13, at 273-274. On cross-examination, Dr. Weissman again opined the intravenous antibiotic treatment on April 27, 2004 was a reasonable initial course of treatment. *See id.* at 310. Counsel for Dr. Decker then inquired as to the addition of Vancomycin on April 28, 2004.

[Counsel for Dr. Decker:]

Q. … [A]s soon as Dr. Decker saw the increased white blood count from 6:00 that morning – because he was in, he said somewhere between ten and noon, so he saw that laboratory data -- he immediately added Vancomycin by mouth. Did you see that?

[Dr. Weissman:]

A. As I stated earlier, he did that, and I thought that was appropriate.

*Id.* at 310-311. The Majority concludes that these two opinions "were so directly in conflict as to the standard of care as to effectively neutralize each other." Majority Memorandum at 11. I cannot agree. There is no doubt that both experts testified that the intravenous administration of Flagyl was an appropriate course of treatment for Decedent on April 27, 2004. *See* N.T., 9/9/13, at 57; N.T., 9/12/13, at 273-274, 310-311. Dr. Lipsky opined

- 8 -

that at that time, Vancomycin should also have been introduced as an oral medication. There was no absolute contradiction of that opinion by Dr. Weissman opining that the addition of Vancomycin upon Dr. Decker's assessment of her condition on April 28, 2004 was fitting. Dr. Weissman was asked if the introduction of Vancomycin was appropriate based on Decedent's condition on April 28, 2004. His opinion did not render Dr. Lipsky's opinion neutralized because he did not testify regarding whether the Vancomycin should have been introduced earlier or opine that Vancomycin was not a required or appropriate addition to Decedent's medication regime thus creating an absolute conflict as between the two expert opinions. He merely opined that its introduction, based on her condition April 28, 2004, was appropriate. The instant issue is more akin to the expert opinions rendered in **Brodowski** as discussed *supra*. Herein, the experts were not in direct conflict because the testimony given by Dr. Weissman did not contradict Dr. Lipsky's opinion that the standard of care required introduction of oral Vancomycin at the same time as the introduction of intravenous Flagyl. **See Brodowski**, **supra**.

Accordingly, I cannot conclude there was an absolute contradiction of the experts' opinions on the administration of antibiotics or that the experts so vitally disagreed on essential points as to neutralize each other's opinion evidence. **See Brannan**, **supra**. Therefore, I conclude the trial court erred in granting nonsuit on this basis.

Next, the Majority concludes Executor failed to establish Drs. Castellano and Decker breached the standard of care by not calling to check on Decedent and ordering a surgical consult. Majority Memorandum at 12-15.

Dr. Lipsky testified that after the surgical consult performed at 8:30 a.m. on April 28, 2004, there should have been another consult.

> [Counsel for Executor:]
>
> Q. [] Doctor, given the information provided regarding [Decedent]'s condition in terms of April 28[th] of 2004, after the surgical consult was done in the early morning, and I believe it was 8:30 in the morning on the 28[th], was there a period of time where any of the physicians, treating physicians, should have been brought back for a consult for surgery to evaluate [Decedent] after the 8:30 a.m., April 28[th] time period?
>
> [Dr. Lipsky:]
>
> A. Yes. Clearly on the 28[th], things had changed from the 27[th], including as we mentioned before, the acidosis, which was now documented, and the marked elevation of the white blood cells, which was very disturbing.
>
> The clinical exam remained – remained fairly severe with diffused abdominal tenderness, abdominal distention. This already had persisted, probably for over 48 hours and not improved.
>
> As I mentioned, the decrease in the quantity of the bowel movements would not have been reassuring to me. It might have [] disturbed me that something else might have been brewing that was more of an emergency.
>
> The answer is yes.

- 10 -

N.T., 9/9/13, at 52-53. Dr. Lipsky did not render an opinion regarding whether the standard of care required Drs. Castellano and Decker to check on the status of Decedent after their respective assessments of her.

Dr. Weissman also testified that a surgical consult should have been conducted on Decedent.

> [Counsel for Executor:]
>
> Q. … Doctor, do you have an opinion within a reasonable degree of medical certainty if there were any deviations of the standard of care by Dr. Decker on April 28th, … ?
>
> …
>
> [Dr. Weissman:]
>
> A. My opinion is that on the -- [Decedent]'s clinical condition worsened on the 28th and – clinically and also on the basis of the laboratory data from that day.
>
> Q. Do you have an opinion within a reasonable amount of medical certainty if a surgical consult should have been done after 8:30 a.m. on April 28th?
>
> A. Based on the clinical and laboratory information, I think it would have been appropriate for the surgeon to be called back to reassess [Decedent].

N.T., 9/12/13, at 290-291. Dr. Weissman testified further that the deviation from the standard of care caused harm or resulted in Decedent's death and also increased the risk of harm to Decedent. *Id.* at 291. He later testified as to the obligation Drs. Castellano and Decker had to Decedent.

> [Counsel for Executor:]

Q.   Doctor, … on [April] 28th, given [Decedent]'s condition, did [Drs. Decker and Castellano] in this case, should they have called back to check on her condition later in the day on the 28th?

[Dr. Weissman:]

A.  In my opinion?

Q.  Yes.

A.  Yes.

N.T., 9/12/13, at 351.  After this testimony, counsel for Dr. Castellano cross-examined Dr. Weissman.  Dr. Weissman agreed nurses are the "eyes and ears" of physicians, and "one type of standard of care" is for a nurse to contact a physician regarding a patient who is experiencing a problem or a change in condition.  *Id.* at 353.  Immediately thereafter, counsel for Dr. Decker addressed the issue of calling back.

[Counsel for Dr. Decker:]

Q.  Dr. Decker had no tests outstanding that he was going to call back to say, how did that test turn out that I ordered, did he?

[Dr. Weissman:]

A.  There were no tests outstanding, but **there was a patient outstanding**.

*Id.* at 354-355 (emphasis added).

Again, there is no doubt that both experts proffered opinions that the standard of care was breached when a surgical consult was not conducted following the initial consult at 8:30 a.m. on April 28, 2004.  Because Dr.

- 12 -

Lipsky offered no testimony on this issue, the instant matter bears more resemblance to the testimony of the single expert witness in **Brannan**. Though on cross-examination, Dr. Weissman conceded doctors rely on other hospital staff to alert them to a patient's condition, his testimony, in its entirety, was not, as the trial court found and the Majority concludes, **wholly** inconsistent with his earlier testimony that the standard of care required physicians to call the hospital nor was it "tantamount to no standard of care testimony at all." Majority Memorandum at 16. Dr. Weissman testified Drs. Decker and Castellano should have called back to check on Decedent. The concession that "one type of standard of care" permitted physicians to wait to be contacted by nursing staff before checking on a patient was a minor divergence from the conclusion that the defendant physicians in the instant case should have called back. Moreover, Dr. Weissman's later testimony in response to counsel for Dr. Decker noting Dr. Decker had no outstanding tests on Decedent, reaffirmed Dr. Weissman's earlier opinion that Decedent and her care were still outstanding, and the defendant physicians should have called to check on her status. **See** N.T., 9/12/13, at 355. Therefore, I conclude the minor divergence in the part of Dr. Weissman's testimony regarding the nursing staff notifying physicians, when viewed against his testimony, as a whole, did not sufficiently compromise his testimony on direct to justify the removal of the issue from the jury's consideration. **See Brannan**, **supra**.

- 13 -

Accordingly, based on the foregoing discussion, it is my view that the two expert witnesses' testimony did not present an absolute contradiction nor did the experts so vitally disagree on essential points as to effectively neutralize the other's opinion. **See id**; **Brodowski**, **supra**. Because I conclude the conflicts in the testimony of Drs. Lipsky and Weissman were not absolute, I believe any minor conflicts in their testimony should have been considered and resolved by the jury. **See Brannan**, **supra**. Likewise, giving Executor the benefit of all the favorable evidence and reasonable inferences derived therefrom, I conclude Executor has established a right to relief rendering the grant of compulsory nonsuit an error of law. **See Staiger**, **supra**. Consequently, I would reverse the order of the trial court and remand for a new trial. I respectfully dissent.