J-A06042-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CHRISTOPHER WHITE AND NINA WHITE, INDIVIDUALLY AND AS ADMINISTRATORS OF THE ESTATE OF RICHARD C. WHITE A/K/A RICHARD CURTIS WHITE, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| RICHARD M. CORNISH, M.D., DARELL T. COVINGTON, M.D., POCONO EMERGENCY ASSOCIATES, P.C., AND POCONO MEDICAL CENTER | |
| Appellees | No. 1806 EDA 2014 |

Appeal from the Order June 4, 2014
In the Court of Common Pleas of Monroe County
Civil Division at No(s): 8231-CV-2012

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.: **FILED APRIL 13, 2015**

Appellants Christopher and Nina White, as Administrators of the Estate of Richard C. White, filed this medical malpractice action against Richard M. Cornish, M.D., Pocono Emergency Physicians, P.C.,[1] Darrell T. Covington, M.D., and Pocono Medical Center. The trial court granted summary judgment for Dr. Covington, finding he owed no duty to Mr. White and

---

[1] Appellants initially named "Pocono Emergency Associates, P.C." as a defendant. The parties agreed the appropriate party was "Pocono Emergency Physicians," but did not formally correct the caption.

finding Appellants' experts provided contradictory testimony. We reverse and remand.

Mr. White was Dr. Covington's patient beginning in 2003. Opinion, 5/13/2014, at 3. On July 22, 2009, Dr. Covington maintains he sent Mr. White the following unsigned letter:

> This letter is to notify you that your past due account in the sum of $44.18 has been written off as an "Uncollected Bad Debt". We have billed you on several occasions by statement with no response from you. As of thirty (30) days from the above date listed, we can no longer provide services to you as your doctor due to the non-payment of your account. If you pay this amount in full, we will reconsider seeing you as our patient.
>
> Should you have any questions, please call our office at (570) 421-8968 between the hours of 9:00 AM and 5:00 PM on Tuesdays, Wednesdays or Fridays.

Letter From Darell T. Covington, M.D. to Richard C. White dated July 22, 2009, Motion for Summary Judgment of Defendant, Darell T. Covington, M.D. at Exh. B. Mr. White did not pay this balance. Dr. Covington sent at least one similar letter to Mr. White in the past, but resumed treating Mr. White after discussing payment obligations with him. N.T. of Dep. of Dr. Covington, 2/6/2014, at 160-165 [Covington Dep. Vol. II]. However, Mr. White did not visit Dr. Covington following the July 22, 2009 letter.

On September 22, 2010, Mr. White was treated at the Pocono Medical Center emergency department and discharged. Report of Ira Mehlman, M.D., at 2. On September 29, 2010, Mr. White visited Nicholas Teleo, M.D., a surgeon. *Id.* Dr. Teleo's notes regarding Mr. White's history state:

"Incisional hernia – behind colostomy – watched by Dr. Covington." Covington Dep. Vol. II, at 151.[2]

On October 3, 2010, Mr. White was again admitted to the Pocono Medical Center emergency department, where Dr. Cornish, an emergency room physician, treated him. Following a CT scan, a radiologist recommended a surgical consult. Imaging Report, Pocono Medical Center Imaging Services, dated 10/3/2010. At Mr. White's request, Dr. Cornish called Dr. Covington, a colo-rectal surgeon. N.T. of Dep. of Dr. Cornish, at 124. The telephone call lasted three minutes and fourteen seconds.[3] *Id.* at 127-28, 165-68. Dr. Cornish testified that the conversation with Dr. Covington was a surgical consultation and that he relied on this conversation when discharging Mr. White. *Id.* He stated that Dr. Covington said he believed Mr. White was suffering from enteritis and did not require a surgical admission to the hospital. *Id.* Further, Dr. Cornish testified that Dr. Covington said he "would be happy to see [Mr. White] as an out-patient if no

_____

[2] Dr. Covington testified Dr. Teleo was wrong. Covington Dep. Vol. II, at 149-151.

[3] The contents of this telephone call are disputed. Dr. Covington disputes Dr. Cornish's version of the telephone call and claims he told Dr. Cornish that Mr. White was not his patient. N.T. of Dep. of Dr. Covington, 11/21/2013, at 71 [Covington Dep. Vol. I]; N.T. of Dep. of Dr. Cornish, at 166 (Dr. Covington did not say Mr. White was not his patient). We view the disputed facts in the light most favorable to Appellants, the non-moving parties. *See Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa.2010).

better in several days." *Id.* at 128. Dr. Cornish stated Dr. Covington asked questions to be presented to Mr. White, and that he [Dr. Cornish] relayed Mr. White's answers to Dr. Covington. *Id.* at 124.

After this telephone conversation, Dr. Cornish discharged Mr. White from the emergency department and gave discharge instructions, which provided a diagnosis of gastroenteritis and listed Dr. Covington as the follow-up contact. N.T. of Dep. Dr. Cornish, at 127-31. On October 3, 2010, the Pocono Medical Center emergency department faxed a copy of Mr. White's emergency room record to Dr. Covington. Covington Dep. Vol. I, at 97-100. Dr. Covington received it, signed it, and placed it in Mr. White's chart. *Id.*

On October 5, 2010, Mr. White returned to the emergency department. Covington Dep. Vol. II, at 231. That same day, Dr. Cornish put the following note in the emergency room record concerning the visit of October 3, 2010:

> The increased bowel distention on the CT compared to the CT from the 22-September, as well as the protracted nature of the illness and the increased WBC count prompted me to suggest to the patient that I consult surgery. The patient expressed desire for me to call Dr. Covington, who had operated him [sic] in the past. I described the case to Dr. Covington, to include the H&P, the physical exam, the labs and the CT readings. I reentered the patient's room during that call to obtain detailed answers from the patient to some of Dr. Covington's questions. Dr. Covington felt that the patient was likely to have an enteritis rather than a bowel obstruction on the basis of the watery diarrhea and elevated WBC, the continuance of flatus and the lack of

> abdominal tenderness. He did not feel that he needed surgical admission, but would be happy to see him as an outpatient if no better in several days. I conveyed his impression to the patient.

Pocono Medical Center Emergency Record, Doctor Notes, 10/5/2010, Bates No. 00371; N.T. of Dep. of Dr. Cornish, at 97-98.[4]

Although Dr. Covington performed emergency surgery on Mr. White, Mr. White died on October 8, 2010.[5] Covington Dep. Vol. II, at 230. The certificate of death completed by Dr. Covington lists the cause of death as gangrenous/ischemic small bowel, sepsis, and multiple system failure. *Id.* at 230-33. It also states Mr. White was in "septic shock" when admitted on October 5, 2010. *Id.* at 229.

Appellants produced expert reports from Ralph Silverman, M.D., a colo-rectal surgeon, Albert Weihl, M.D., an emergency department physician, and Ira Mehlman, M.D., an emergency medicine physician.

Dr. Silverman opined:

_____

[4] Dr. Cornish entered this note after Mr. White returned to the emergency department on October 5, 2010. N.T. of Dep. of Dr. Cornish, at 54. He stated that Mr. White's return to the emergency department "prompted me to look at that chart from the 3rd to refresh my memory as to the patient's status and I think it's probable to say if I had no other patients to see or no other work that was pending that I would have just gone ahead and completed the chart at that time." *Id.* at 54-55.

[5] Dr. Covington testified that he received a call from the hospital on October 5, 2010 informing him that Mr. White was at the emergency room, was in septic shock, and the surgeon that was at the hospital was performing another operation. Covington Dep. Vol. II, at 167-69. Therefore, Dr. Covington went to the hospital and operated on Mr. White because "there was no one available to operate and [Mr. White] was dying." *Id.*

Based on the fact that Dr. Cornish called Dr. Covington and that Dr. Covington said it was okay to discharge the patient, a formal consult was initiated. Mr. White's past noncompliance with fiscal responsibilities is not an acceptable excuse to refuse care in a potential emergent situation especially when the consult has been initiated. As such, Dr. Covington's refusal to allow a full presentation by Dr. Cornish of Mr. White's case, and thus refusing to assist this ER doctor and patient, was a deviation from the standard of care.

. . .

Surgical intervention was the only way to decrease Mr. White's risk of further complications and death. Dr. Covington's refusal to come to the ER and evaluate Mr. White contributed to a delay in the necessary surgical care and was a deviation from the standard of care which increased Mr. White's risk of death.

Email from Ralph Silverman to Thomas J. Foley, dated Mar. 18, 2014.

Dr. Weihl opined:

In spite of the above, with ongoing unrelieved symptoms for over 10 days, marked presumed new abnormalities in laboratory testing indicating severe hyperglycemia, severe elevation of white blood count, moderate unexplained anemia, and new renal insufficiency, and a CT scan showing progressive abnormalities, Dr. Cornish relied upon only a telephone consultation with a surgeon and discharged Mr. White to his home.

On October 3, 2010[,] Dr. Cornish deviated from the standard of care and discharged Mr. White from the Pocono Medical Center Emergency Department on a dangerous drug therapy plan. Mr. White instead required immediate admission to the hospital for medical treatment of his multiple, newly discovered, metabolic and hematologic abnormalities, and for surgical consultation with a surgeon who actually examined and evaluated the patient in person.

On October 3, 2010, Mr. White could not be reasonably, prudently or safely discharged from the hospital. Telephone contact by Dr. Cornish was required with Mr.

White's primary physician, and arrangement for admission to the hospital was required for urgently needed treatment and further medical and surgical evaluation. Discharging Mr. White to his home on October 3, 2010, in violation of the standard of care, exposed Mr. White to increased risk of harm and led directly to his death on October 8, 2010.

Letter from Albert C. Weihl, M.D., to The Foley Law Firm, dated Sept. 19, 2012, at 3-4.

Dr. Mehlman opined:

Dr. Cornish's deposition remarks about the CAT scan of the abdomen/pelvis . . ., his patient's wrongly labeled "aggressive" hydration . . . , the "black box" warnings about metformin . . . , the management and interpretation of [Mr. White's] very critical glucose of >450 repeated and its appropriate management . . . , a failure to understand and know the critical concepts of SIRS . . . , and an apparent 3 minutes 14 second conversation with Dr. Covington . . . which he believes allowed him to discharge this patient [is] very concerning and either represent[s] a significant lack of knowledge, lack of concern, "asleep at the wheel", or "something else" — and Dr. Cornish's ultimate action of discharging this patient denied him a good outcome and survival. The standard of care of emergency medicine doctors is that they generally do not admit patients themselves, BUT they do get patients admitted by calling appropriate doctors, either of that patient or on call for the ED that day, who then admit the patients after an appropriate and meaningful conversation. Emergency medicine doctors do not send seriously ill patients requesting help home whatever anyone else tells them: that is the standard of care. And there are many mechanisms available to make the right thing, the right outcome happen[.] Dr. Cornish, when all is said and done, regardless of whatever (contested) conversation he might have had with Dr. Covington, did not make the right things happen, thus, he did not meet the standard of care on 10/3/10, with patient [Mr. White], and that denied [Mr. White] the chance to survive and assured his death. On page 112 of his deposition, Dr. Cornish stated that "it was my judgment that he didn't require admission": this was

very wrong, and reflects the failures on multiple levels of Dr. Cornish to hear, understand and process the information he had on patient [Mr. White], and what it meant clinically, and what the standard of care required. This failure to admit and further evaluate and treat patient [Mr. White], assured his patient's death.

. . .

Regardless of what Dr. Covington might have thought, might have said in the roughly 3 minute and 14 second conversation, ultimately, Dr. Cornish should never have discharged patient [Mr. White] from what he knew, and should have understood, with the available ancillary tests he had (imaging and many abnormal serious lab tests, such as WBC, BUN/creatinine, glucose, Na, $CO_2$).

Letter from Ira Mehlman, M.D. to Foley Law Firm, dated 3/17/2014, at 4-7.

On March 17, 2014, Dr. Covington filed a motion for summary judgment. On May 13, 2014, the trial court granted summary judgment in favor of Dr. Covington. On May 15, 2014, Appellants filed a motion for reconsideration and vacatur of the May 13, 2014 order or, in the alternative, for a stay of proceedings and appellate certification. On June 4, 2014, the trial court issued an amended order, reaffirming summary judgment for Dr. Covington, but certifying the order as a final order for appellate purposes pursuant to Pennsylvania Rule of Appellate Procedure 341(c)[6] and 42 Pa.C.S. § 702(a).[7]

_____

[6] Rule 341(c) provides: "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim or when multiple parties are involved, the trial court or other governmental unit may enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case. Such an order becomes
*(Footnote Continued Next Page)*

Appellants raise the following issues on appeal:

> I.  Whether the honorable trial court erred in granting summary judgment based upon the alleged lack of duty, or absence of a doctor-patient relationship,[] as between defendant[,] Dr. Covington[,] and decedent?
>
> II.  Whether the honorable trial court erred in applying ***Mudano v. Philadelphia Rapid Transit Co.***, 289 Pa. 51, 137 A.104 (1927) and granting summary judgment on the alternative ground that [appellants'] expert reports allegedly conflicted with one another?

Appellant's Brief at 3 (unnecessary capitalization omitted).

"[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." ***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1159 (Pa.2010) (quoting ***Atcovitz v. Gulph Mills Tennis Club, Inc.***, 812 A.2d 1218, 1221 (Pa.2002)). A "trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party" and "must resolve all doubts as to the existence of a genuine issue of material fact against the moving party." ***Id.*** (citing ***Toy v. Metropolitan Life Ins.***

*(Footnote Continued)* ───────────────

appealable when entered. In the absence of such a determination and entry of a final order, any order or other form of decision that adjudicates fewer than all the claims and parties shall not constitute a final order."

[7] Section 702(a) provides: "**(a) Appeals authorized by law.--**An appeal authorized by law from an interlocutory order in a matter shall be taken to the appellate court having jurisdiction of final orders in such matter."

*Co.,* 928 A.2d 186, 195 (Pa.2007)). Therefore, a trial court "may only grant summary judgment 'where the right to such judgment is clear and free from all doubt.'" *Id.*

This Court "may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion." *Summers*, 997 A.2d at 1159 (quoting *Weaver v. Lancaster Newspapers, Inc.,* 926 A.2d 899, 902–03 (Pa.2007)). Whether there are no genuine issues as to any material fact presents a question of law, and, therefore, our standard of review is *de novo. Id.* "[W]e need not defer to the determinations made by" the trial court. *Id.*

Appellants' first claim alleges the trial court erred in finding, as a matter of law, that no doctor-patient relationship existed. We agree.

To establish medical negligence, a plaintiff must prove "a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of harm." *Vazquez v. CHS Professional Practice, P.C.*, 39 A.3d 395, 397 (Pa.Super.2012) (quoting *Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1070–1071 (Pa.2006)).

The trial court found Dr. Covington did not owe a duty to Mr. White because no physician-patient relationship existed. It found, as a matter of law, no physician-patient relationship existed on October 3, 2010, and the

telephone conversation between Dr. Cornish and Dr. Covington did not reestablish a physician-patient relationship. Opinion, 5-13/2014, at 5.

If Dr. Covington and Mr. White had a physician-patient relationship, then Dr. Covington owed Mr. White a duty to act within the standard of care. *See Tomko v. Marks*, 602 A.2d 890, 892 (Pa.Super.1992) (duty owed by physician "arises from the physician-patient relationship" (quoting *Craddock v. Gross*, 504 A.2d 1300, 1302 (Pa.Super.1986))). There is no Pennsylvania precedent discussing whether a physician-patient relationship exists in circumstances similar to those presented in this case and, therefore, we review decisions from other jurisdictions for guidance.

In *Campbell v. Haber*, the New York Supreme Court, Appellate Division, found an implied physician-patient relationship may have existed where a physician called the cardiologist on call, who provided an opinion on the test results, and the emergency room physician relayed the findings to the patient and discharged him. 274 A.D.2d 946, 946-47 (N.Y.2000). It found that whether a physician-patient relationship existed was a question of fact for the jury. *Id.* The dissenting opinion in *Campbell* found that "what transpired during the brief telephone call . . . did not give rise to a physician-patient relationship between [the cardiologist] and [the] plaintiff. In the absence of such relationship, there is no legal duty and hence no basis for liability for medical malpractice." *Id.* at 948. It noted there was no express undertaking to provide medical treatment and the cardiologist did not undertake to supervise the emergency room physician. The physician never

- 11 -

formally engaged the cardiologist as a consultant and the cardiologist only had the information provided to him by the physician. The dissent further noted there was no prior or subsequent relationship with the plaintiff and the cardiologist never had direct contact with the plaintiff. *Id.* It concluded that "[l]iability should not be predicated on the sort of informal consultation between professionals that occurred here." *Id.*

In *Cogswell v. Chapman*, 249 A.D.2d 865, 866 (N.Y.1998), the New York Supreme Court, Appellate Division, found a physician-patient relationship can be established by telephone if the call "'affirmatively advis[es] a prospective patient as to a course of treatment" and it is foreseeable that the patient would rely on the advice. In *Cogswell*, an ophthalmologist discussed a patient's injury with the emergency room physician, including minimal activity restrictions and follow-up visits, and the written instructions provided to the patient were identical to those the ophthalmologist stated he provided to the emergency room doctor. *Id.* at 866-67. The Court found an issue of fact existed regarding the ophthalmologist's level of participation because, under the totality of the circumstances, a jury could find the ophthalmologist had more than an informal interest and involvement in the patient's care. *Id.* at 867.

Alternately, other courts have found that no physician-patient relationship arises where a doctor is called for consultation, but does not examine the patient, review the records, or anticipate a future physician-patient relationship. *See, e.g., Lopez v. Aziz*, 852 S.W.2d 303, 305-307

(Tex.App.1993) (no physician-patient relationship where doctor consulted OB-GYN specialist by telephone and followed the specialist's advice, where there was no contract to perform services, specialist did not accept any work relating to plaintiff, did not conduct any tests or review any test results, did not prepare any reports, and did not bill plaintiff, noting specialist "did no more than answer the professional inquiry of a colleague"); ***Reynolds v. Decatur Memorial Hosp.***, 660 N.E.2d 235, 237-240 (Ill.App.1996) (no physician-patient relationship existed where emergency room doctor called specialist, advised him of the circumstances of plaintiff's admission to hospital, and specialist asked questions, but specialist did not treat the patient or commit to further involvement in his care, did not see, examine or diagnose plaintiff, and did not bill for services); ***cf. Hill v. Kokosky***, 186 Mich.App. 300 (2002) (specialist owed no duty to patient, where patient's obstetrician contacted specialists by telephone for opinions regarding the plaintiff's case, obstetrician provided the case history, but did not refer plaintiff to specialists and specialists did not examine plaintiff or review her chart, plaintiff did not seek specialists' medical advice or treatment, and opinions were addressed to the obstetrician as a colleague and were recommendations, not a prescribed course of treatment).

We are constrained to concluded that, as in ***Campbell*** and ***Cogswell***, whether a physician-patient relationship existed between Dr. Covington and Dr. White raises a genuine issue of material fact, which precludes summary judgment.

Initially, a genuine issue of fact exists as to whether Dr. Covington terminated the physician-patient relationship on July 9, 2009. The letter is unsigned, and, although Dr. Covington likely sends such letters in his regular course of business, Dr. Covington presented no proof he mailed the letter. Further, assuming the letter was sent and received, Dr. Covington sent at least one similar letter to Mr. White in the past and nevertheless resumed treatment after discussing payment obligations. However, the July 9, 2009 letter stated the relationship was terminated unless Mr. White paid the balance due, which he failed to do. Further, Dr. Covington provided no treatment between the date of the letter, July 9, 2009, and the date of the telephone call on October 3, 2010.

In addition, a genuine issue of material facts exists as to whether the telephone conversation re-established a physician-patient relationship. Unlike a blind telephone consultation where the doctor does not know the patient, does not examine the patient, and does not review the records, Dr. Covington knew Mr. White, Mr. White asked Dr. Cornish to call Dr. Covington, Dr. Covington asked questions, which Mr. White answered through Dr. Cornish, Dr. Covington received the medical records that same day and placed them in Mr. White's chart, and Dr. Covington told Dr. Cornish

that Mr. White could see him if the problems persisted.[8]  The jury would be in the best position to determine whether a physician-patient relationship existed between Dr. Covington and Mr. White.  Because a genuine issue of material fact exists as to whether there was a physician-patient relationship, summary judgment is not appropriate.

We note that, unlike the cases in which other jurisdictions have found no physician-patient relationship existed as a matter of law, Mr. White and Dr. Covington had a prior physician-patient relationship, Dr. Covington  told Dr. Cornish that Mr. White could see him if the problems persisted,[9] Dr. Covington received and signed Mr. White's emergency room records, and he placed the records in Mr. White's chart.  *See Lopez*, 852 S.W.2d at 305-307; *Reynolds*, 660 N.E.2d at 237-240; *Hill*, 186 Mich.App. at 300.

Appellants next contend the trial court erred when it applied *Mudano v. Phila. Rapid Transit Co.*, 137 A. 104, 106 (Pa.1927), to find Appellants' experts' opinions conflicted with each other.  Appellants' Brief at 28-50.  We agree.

In *Mudano*, the Supreme Court of Pennsylvania found that a plaintiff fails to sustain his burden of proof if he presents conflicting expert

---

[8] As we noted, Dr. Covington disputes this version of events.  However, for purposes of this appeal, we must view the facts in favor of the Appellants, the non-moving party.  *See Summers*, 997 A.2d at 1159.

[9] Dr. Covington denies informing Dr. Cornish that Mr. White could see him if the problems persisted.  Covington Dep. Vol. I at 93-94.

testimony. *Mudano*, 137 A. at 106. The Court reasoned that if expert testimony "was so conflicting regarding the proper inference to be drawn as to render either one of two inconsistent inferences possible of adoption, the adoption of the one or the other would be nothing more than a guess." *Id.* In *Mudano*, the Court found the trial court should have granted a compulsory non-suit, as the two experts presented by the plaintiff were so contradictory regarding the cause of plaintiff's injury as to neutralize each other's opinions.

In *Brannon v. Lankenau Hospital*, the plaintiff's expert testified on direct examination that the defendant's conduct fell below the 1965 standard of care. 417 A.2d 196 (Pa.1980). The next day on re-direct he stated he could not answer whether the conduct fell below the standard of care, but then re-affirmed, again on re-direct, that the conduct fell below the standard of care. *Id.* at 200. The Supreme Court of Pennsylvania found a compulsory non-suit not proper, reasoning the testimony was a "relatively minor divergence in only a part of appellant's expert testimony," and "when viewed against the testimony as a whole, [it did not] sufficiently compromise[] the witness' testimony on direct to justify removal of this issue from jury consideration." *Id.*

In *Brodowski v. Ryave*, this Court noted that "conflicts in [expert] testimony are fatal only if absolute." 885 A.2d 1045, 1060-61 (Pa.Super.2005) (quoting *Brannan*, 417 A.2d 200) (alteration in original). The Court in *Brodowski* found no irreconcilable conflict where one expert

testified that Dr. Ryave breached the standard of care "by failing to admit Plaintiff to a 'proper place prior to his departure' even though he had more than two hours to do so," for failing to effectuate the proper consultation with a neurologist, and for failing to properly sign out to the oncoming ER doctor. *Id.* at 1061. A second expert testified that Dr. Ryave "did a very good job in his evaluation and assessment" of Plaintiff and Dr. Ryave "did a good job in his evaluation, but something fell apart after he left. He was meant to properly convey to the ER doctor who was taking over that this patient needed to be admitted to the hospital for evaluation of stroke, but something went awry at that point." *Id.* The second expert also testified that "part of [Dr. Ryave's] job was to . . . appropriately sign her out when he left his shift at 7:00 p.m. There was clearly some kind of breakdown that occurred at that point." *Id.* This Court found:

> The experts' testimony did not present an irreconcilable conflict such that the *Mudano* rule would apply to neutralize their opinions with regard to Dr. Ryave's care. Both experts' opinions were consistent in that Dr. Ryave may not have properly signed out before his departure. Moreover, although Expert Preston stated that Dr. Ryave's evaluation, assessment, and differential diagnosis were proper, Expert Chamovitz did not specifically opine on these issues but, rather, opined on issues of treatment implementation. Overall, the two experts' testimony did not present a *Mudano* conflict and the trial court erred by granting Dr. Ryave's nonsuit on that basis.

*Id.* The *Brodowski* court, however, found an irreconcilable conflict with regard to the expert testimony regarding a second defendant, Dr. Vagano. One expert testified Dr. Vagano should have obtained a neurology consult

- 17 -

himself. *Id.* at 1061-62. A second expert, however, stated it would have been a good idea to have the patient seen by a neurologist, but it was often the attending doctor that decides upon a neurologist and it would not be Dr. Vagano's duty to obtain the consult. *Id.*

Here, Appellants' expert reports did not contain irreconcilable conflicts. The experts opined that Dr. Covington, as a surgeon, deviated from the standard of care when he provided his consultation by phone, without examining the patient, and Dr. Cornish, as an emergency room physician, deviated from a standard of care when he relied on the telephone consultation. Nothing would preclude a jury from relying on the experts' testimony to find Dr. Covington, Dr. Cornish, or both, deviated from standards of care.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/13/2015

- 18 -